CENTRAL ILLINOIS PUBLIC SERVICE COMPANY, Petitioner, v. ILLINOIS COMMERCE COMMISSION *et al.*, Respondents.—CITIZENS UTILITY BOARD, Petitioner, v. ILLINOIS COMMERCE COMMISSION *et al.*, Respondents.

Fourth District   Nos. 4—92—0459, 4—92—0472 cons.

Opinion filed March 30, 1993.

Carmen L. Fosco (argued), Special Assistant Attorney General, of Illinois Commerce Commission, of Chicago, for Illinois Commerce Commission.

David J. Rosso (argued), Boyd J. Springer, Karl B. Anderson, and Christopher W. Flynn, all of Jones, Day, Reavis & Pogue, of Chicago, for Central Illinois Public Service Company.

Susan L. Satter (argued), of Citizens Utility Board, of Chicago, for Citizens Utility Board.

PRESIDING JUSTICE STEIGMANN delivered the opinion of the court:

This appeal arises out of orders of the Illinois Commerce Commission (Commission) entered in a proceeding to determine the propriety of new tariff sheets filed by Central Illinois Public Service Company (CIPS). (*Central Illinois Public Service Co.* (Mar. 18, 1992), Ill. Com. Comm'n No. 91—0193 (Commerce Commission's order) (hereinafter Commerce Commission's order).) CIPS proposed a general increase in electric and gas rates. CIPS and the Citizens Utility Board (CUB), an intervenor, appeal from certain determinations made by the Commission in its order.

On April 24, 1991, CIPS filed with the Commission proposed revised tariff sheets for gas and electric service. The rates contained in these tariffs were designed to produce an annual increase in gas revenues of approximately $12 million and an annual increase in electric revenues of approximately $18.8 million. The Commission suspended

the proposed rates and commenced hearings on the propriety of the increases sought by CIPS.

The Commission issued its order on March 18, 1992, and denied CIPS' and CUB's applications for rehearing on May 6, 1992. CIPS and CUB brought these appeals, which this court consolidated in No. 4—92—0459.

CIPS argues that the Commission erred by (1) requiring it to allocate its electric revenues, expenses, and rate base by jurisdiction, (2) adjusting CIPS' wage and salary expenses based on a "WEFA" (Wharton Econometrics Forecasting Association) escalator, and (3) excluding unamortized rate case expenses from the rate base. In No. 4—92—0472, CUB argues the Commission erred by (1) including the construction costs of a precipitator in the rate base without an audit, (2) adopting the "average setup method" to return excess accumulated deferred taxes, (3) including CIPS' temporary cash investments in the amount of common equity included in the capital structure, and (4) approving an increase in the residential service charge and a declining block charge for gas usage.

We affirm.

## I. STANDARD OF REVIEW

■ The findings of the Commission are *prima facie* true and correct and cannot be set aside on appeal unless clearly contrary to the manifest weight of the evidence. (Ill. Rev. Stat. 1991, ch. 111²/₃, par. 10—201(d).) Moreover, Commission decisions are entitled to great weight as being the judgment of a tribunal appointed by law and informed by experience. (*Village of Apple River v. Illinois Commerce Comm'n* (1960), 18 Ill. 2d 518, 523, 165 N.E.2d 329, 332; *United Cities Gas Co. v. Illinois Commerce Comm'n* (1992), 225 Ill. App. 3d 771, 777, 587 N.E.2d 581, 585.) In reviewing Commission decisions, the court is limited to determining whether (1) the Commission's decision was within the scope of its statutory authority, (2) the Commission made findings adequate to support its decision, (3) the findings have substantial evidentiary support in the record, and (4) the Commission's decision infringed upon constitutional rights. (*Illinois Bell Telephone Co. v. Illinois Commerce Comm'n* (1973), 55 Ill. 2d 461, 469, 303 N.E.2d 364, 369; *United Cities Gas*, 225 Ill. App. 3d at 777, 587 N.E.2d at 585.) Deference to the judgment of the Commission is particularly appropriate in the area of fixing rates. *Iowa-Illinois Gas & Electric Co. v. Illinois Commerce Comm'n* (1960), 19 Ill. 2d 436, 442, 167 N.E.2d 414, 417; *United Cities Gas*, 225 Ill. App. 3d at 777, 587 N.E.2d at 585.

## II. Jurisdictional Allocation

■ CIPS first challenges the Commission's decision to require it to make jurisdictional allocations of rate base, expenses, and revenues. The Commission regulates only the rates charged for service to retail customers. Electric utilities, however, make sales of electricity to nonretail customers, such as other utilities, for resale to their own customers. These sales are subject to the jurisdiction of the Federal Energy Regulatory Commission. There are two alternative ways in which a utility's nonretail sales may be treated by the Commission in determining the appropriate rates to charge retail customers. The first method is to perform jurisdictional allocations, *i.e.*, to allocate, using appropriate factors, the utility's rate base, expenses and revenues between retail and nonretail ratepayers. Only those portions of the utility's rate base, expenses and revenues allocated to retail ratepayers are then considered in setting retail rates. Under the second method, no jurisdictional allocations are performed. Rather, all revenues from the sales to nonretail customers are subtracted from the revenue requirement used to develop retail rates. In effect, the nonretail revenues are credited to the retail ratepayers.

Section 285.2000(b) of title 83 of the Illinois Administrative Code (Code) provides:

"[A] utility need not make any non-jurisdictional allocations where total utility non-jurisdictional revenues for which rate relief is requested for the type of service are equal to, or less than, 5% of total company utility revenues." 83 Ill. Adm. Code §285.2000(b) (1991).

CIPS did not perform a jurisdictional allocation in developing the test-year data presented in support of its proposed rates. Both the Commission and CIPS concede that CIPS' nonjurisdictional nonretail revenues are less than 5% of CIPS' total utility revenues. In its order, the Commission confirmed that section 285.2000(b) of title 83 of the Code applies to this case:

"83 Ill. Adm. Code [§]285.2000 sets a threshold of 5% of total sales revenues before revenues associated with non-jurisdictional sales are required to be jurisdictionalized in rate case filings. The Company cited this provision in support of its position that it was not required to file a jurisdictionalized revenue requirement in this proceeding. The Commission agrees with CIPS' contention in this regard." Commerce Commission's order, at 14.

The Commission went on to find that the jurisdictional allocation should have been used and rejected CIPS' methodology while adopting the staff methodology, which required jurisdictional allocation of nonretail revenues. CIPS contends that because its nonutility revenues were less than 5% of its total revenues, it was not required to make a jurisdictional allocation. CIPS argues that the Commission's decision to require the jurisdictional allocation of electric revenues, expenses and rate base violated the Commission's rules and violated CIPS' due process rights. According to CIPS, agencies such as the Commission are required to follow their own rules in reaching a decision. See *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1989), 136 Ill. 2d 192, 228, 555 N.E.2d 693, 709 (*BPI I*) ("the Commission cannot violate the Act or its own rules"); *Hetzer v. State Police Merit Board* (1977), 49 Ill. App. 3d 1045, 1047, 365 N.E.2d 261, 263 ("[h]aving once established rules pursuant to statutory authority, an administrative agency is bound by these rules and may not violate them").

CIPS argues that the Illinois Supreme Court has reversed orders of the Commission where the Commission failed to adhere to provisions of the rules contained in the standard filing requirements when setting rates. (See *BPI*, 136 Ill. 2d 192, 555 N.E.2d 693; *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1991), 146 Ill. 2d 175, 585 N.E.2d 1032 (*BPI II*).) In *BPI I*, the court reversed an order in which the Commission approved rates established over a five-year period. CIPS contends that the court in *BPI I* held that the Commission's order violated the standard filing requirements which require utilities to file supporting proposed rates on the basis of a one-year test year. The *BPI I* court held that the Commission must abide by the "test-year standard or set an articulable alternative standard which the parties and intervenors could follow and on which the parties and intervenors could present evidence." (*BPI*, 136 Ill. 2d at 226, 555 N.E.2d at 708.) The court concluded that the Commission "violated its rules and the Act to the prejudice of the intervenors, and therefore committed reversible error." *BPI*, 136 Ill. 2d at 227, 555 N.E.2d at 709.

In *BPI II*, the court held that the Commission had again violated its test-year rules by providing for the recovery of deferred depreciation expenses. CIPS contends that the court rejected an argument that the Commission had the authority to depart from its rules in that instance as a way of adjusting the problems of regulatory delay. The court held:

"The Commission could have amended its test-year rules to deal with the particular problems created by regulatory delay. Instead the Commission attempted to circumvent the existing rules by improperly treating depreciation as if it were not an operating expense. For this reason, we find the Commission violated its own rules to the detriment of the intervenors and, therefore, committed reversible error." *BPI*, 146 Ill. 2d at 240-41, 585 N.E.2d at 1060.

CIPS contends that the Commission's errors in the present case are identical in nature to the errors committed in *BPI I* and *BPI II*. CIPS argues that the Commission here found CIPS' evidentiary presentation of its revenue requirement on a total company basis met the standard set forth in section 285.2000(b) of title 83 of the Code. CIPS argues that the Commission went on to find that, because a jurisdictional allocation of costs was used by CIPS and deemed appropriate in CIPS' last electric rate case, CIPS had an additional burden of justifying its decision to present its revenue requirement on a total company basis. The Commission held that CIPS did not meet this burden. CIPS notes that section 285.2000(b) of title 83 of the Code clearly provides that a utility "need not" make any jurisdictional allocations unless nonjurisdictional sales revenues exceed 5% of total sales revenues. (83 Ill. Adm. Code §285.2000(b) (1991).) CIPS argues that by applying retroactively a standard different than the standard codified in section 285.2000(b) of title 83 of the Code, the Commission unlawfully attempted to circumvent the existing rules governing the circumstances in which a utility is required to present its case on a jurisdictional allocation basis. Consequently, CIPS contends that the Commission's decision to require jurisdictional allocation was not only contrary to law but violated CIPS' due process rights.

The Commission argues that the "jurisdictional allocation" filing requirement is a minimum procedural filing requirement rather than a substantive rule of law. The Commission contends that the filing requirements are general requirements applicable to all utilities requesting a jurisdictional revenue increase of 1% or more. (See 83 Ill. Adm. Code §285.130 (1991).) The Commission argues that section 285.110 of title 83 of the Code (83 Ill. Adm. Code §285.110 (1991)) of the standard filing requirements specifically provides that the Commission is not bound to a decision based on the minimum filing requirement data. Section 285.110 of title 83 of the Code reads, in pertinent part: "The format presentation of information in these filing requirements should not be construed to bind the Commission to a decision based on this data." 83 Ill. Adm. Code §285.110 (1991).

The Commission concedes that section 285.2000(b) of title 83 of the Code provides that a utility need not make any jurisdictional allocation where total utility nonjurisdictional revenues for which rate relief is requested for the type of service are 5% or less of the total company utility revenues. The Commission contends that, when read in conjunction with sections 285.110 and 285.130 of title 83 of the Code, it is clear that section 285.2000(b) of title 83 of the Code sets forth minimum filing requirements and does not prohibit it from requiring jurisdictional allocation of revenues, rate base and expenses when nonjurisdictional revenues are equal to or less than 5% of total company revenues.

■■ It is well established that administrative rules and regulations are "construed under the same standards which govern the construction of statutes." (*Northern Illinois Automobile Wreckers & Rebuilders Association v. Dixon* (1979), 75 Ill. 2d 53, 58, 387 N.E.2d 320, 323; see also *Ekco, Inc. v. Edgar* (1985), 135 Ill. App. 3d 557, 561, 482 N.E.2d 130, 133.) As with statutes, an "administrative rule must be construed so as to discern and give effect to its intent." *Rend Lake College Federation of Teachers, Local 3708 v. Board of Community College, District No. 521* (1980), 84 Ill. App. 3d 308, 311, 405 N.E.2d 364, 368.

Section 1—102(d)(iii) of the Public Utilities Act (Act) (Ill. Rev. Stat. 1991, ch. 111²/₃, par. 1—102(d)(iii)) clearly declares that one of the goals and objectives of utility regulation is to ensure that "the cost of supplying public utility services is allocated to those who cause the costs to be incurred." The Commission's determination that section 285.2000(b) of title 83 of the Code sets forth minimum filing requirements and does not establish a substantive prohibition is consistent with and supported by the Act's stated goal and objective of ensuring that cost causers are the cost payers.

An agency's interpretation of its own rules will be accorded deference unless clearly erroneous, arbitrary, or unreasonable. (*Ekco, Inc.*, 135 Ill. App. 3d at 561, 482 N.E.2d at 133.) An administrative agency's construction and application of a rule will only be reversed if plainly erroneous. *Rend Lake College*, 84 Ill. App. 3d at 311, 405 N.E.2d at 368.

The Commission's interpretation of section 285.2000(b) of title 83 of the Code is as follows:

"83 Ill. Adm. Code [§]285.2000 sets a threshold of 5% of total sales revenues before revenues associated with non-jurisdictional sales are required to be jurisdictionalized in rate case *filings*. *** [W]hile the Company was not required to file a juris-

dictionalized revenue requirement ***, 83 Ill. Adm. Code [§]285.2000 does not relieve the Company of its duty to present evidence sufficient to meet its burden of proof on the issues of the case. If the overall effect of compliance with the Commission's minimum filing requirements results in the de facto reallocation of all of the Company's investment in rate base to jurisdictional customers, it remains incumbent upon the Company to comply with the statutory requirements of Article 9 of the Act. The fact remains that the Company's proposal to eliminate its retail/non-retail jurisdictionalization will place significant additional generating capacity into [the] retail rate base and corresponding financial burdens upon its retail customers. The Company bears the burden of justifying its proposed treatment of heretofore non-retail capacity, just as it does for any other test year proposal." (Emphasis added.) Commerce Commission's order, at 14.

*BPI I* and *BPI II* are distinguishable in that they involved the Commission's test-year rules and not merely the filing requirements. The jurisdictional allocation rules at issue here relate specifically to utility company filings, whereas the test-year rules at issue in *BPI I* and *BPI II* went to the heart of how a utility is to calculate its revenue requirement rather than to what sort of documentation it must file. The court in *BPI I* and *BPI II* held that the Commission violated its own rules by deviating from the one-year test-year standard in setting rates. Here, the Commission set rates on a single test year. Additionally, in CIPS' past rate cases CIPS filed a jurisdictional allocation of rate base, expenses and revenues. Under section 285.2090 of title 83 of the Code, the Commission correctly required CIPS to provide an acceptable rationale for changing the existing allocation. (83 Ill. Adm. Code §285.2090 (1991).) That section requires a utility to file a schedule B-6.2, explaining the changes in allocation procedures. It reads:

"This schedule shall be completed only if the allocation procedures described in the prior schedules are not consistent with the last Commission order for the company. For each account or component with a change, identify the allocation factor used in the prior order and the rationale for not using that factor in this application." 83 Ill. Adm. Code §285.2090 (1991).

CIPS filed the schedule required by this section, and it read: "Please refer to the testimony of Dan E. Long, CIPS Exhibit 6.0 for an explanation of allocation procedures and changes thereto."

Because its filing represented a change in the jurisdictional allocation, CIPS was required to submit schedule B-6.2 identifying the allo-

cation factor used in the prior order and the rationale for not using that factor in this application so the Commission could determine whether the changes were acceptable. Apparently, the Commission rejected the rationale for the changes and requested further information, specifically the jurisdictional allocation of electric revenues, expenses, and rate base.

CIPS was required to make a jurisdictional allocation in each of its last three electric rate increase requests. In CIPS' last electric rate increase request, the Commission held "[t]he Commission is of the opinion that the electric jurisdictional allocation factors developed by Respondent are reasonable and should be accepted." (*Central Illinois Public Service Co.* (Nov. 23, 1982), Ill. Commerce Comm'n No. 82—0039, at 4 (Commerce Commission's order).) In an earlier CIPS' rate increase request, CIPS made no jurisdictional allocation, and the Commission was forced to develop one. The Commission's order noted that wholesale customers constitute a "substantial portion" of CIPS' electric sales markets and that the Commission must ensure that retail customers "are not subsidizing the wholesale customers." *Re Central Illinois Public Service Co.* (1979), 34 Pub. Util. Rep. 4th 267, 283.

The Commission further held:

"[R]espondent should be required to perform a cost-of-service study in all future electric rate increase requests which will enable the commission to properly remove nonjurisdictional operations for rate-making purposes. Such a study will ensure that the rate of return allowed in each case will apply only to that property used and useful in rendering service to the jurisdictional customers." *Re Central Illinois Public Service Co.*, 34 Pub. Util. Rep. 4th at 283.

As we have noted, a court of review must give substantial deference to an agency's interpretation of its own rules. (See *Ekco, Inc.*, 135 Ill. App. 3d at 561, 482 N.E.2d at 133.) CIPS has failed to show that the Commission's interpretation of its filing requirements was erroneous, arbitrary, or unreasonable. Furthermore, as CIPS was informed in past rate cases that it would be required to file jurisdictional allocations in the future and as testimony from staff witnesses indicated a continued need for CIPS to provide jurisdictional allocations as in its past rate cases, CIPS' due process rights were not violated. Additionally, we note that the Commission's requirement of jurisdictional allocations of electric revenues, expenses, and rate base furthers the public policy of ensuring that retail customers do not pay for the costs created by nonretail customers.

### III. Adjustment Of Wage And Salary Expense Based On A WEFA Escalator

Next, CIPS challenges the Commission's decision to adjust the company's wage and salary expense based on a WEFA escalator. In developing its test-year statements of electric and gas operating income, CIPS projected a 4.2% increase in wage and salary expenses for 1992. In its order, the Commission adopted an adjustment proposal by its staff to reduce CIPS' test-year level of wage and salary expense, and associated payroll tax expenses, based on the use of an escalation rate lower than 4.5%. Specifically, the staff's witness used a 2.8% escalator contained in the November 1991 United States economic outlook table published by the WEFA group.

CIPS argues that the staff's adjustment was unsupported by the record and that the 4.5% increase in wages and salaries projected by CIPS was based on a management decision with regard to the amount of increase necessary to provide a competitive package for CIPS' employees. CIPS notes that the 2.8% WEFA rate represents a projection of the average increase in wage rates in the utility industry generally.

CIPS contends that the sole basis identified by the Commission for its decision was that the Commission used a recent WEFA forecast in a different proceeding. The Commission, in its order, noted that it "previously accepted Staff's use of recent WEFA forecasts in determining payroll expense," citing *"Commonwealth Edison Co.,* Docket No. 90—0169, March 8, 1991, p. 37." (Commerce Commission's order, at 70.) CIPS argues that there was no evidence that the use of the WEFA forecast in the present case was appropriate and the fact that the Commission may have determined that a use of a WEFA escalator was appropriate in *Commonwealth Edison Co.* (Mar. 8, 1991), ＿＿ Ill. Com. Comm'n ＿＿ (No. 90—0169), based on the evidence of record in that case, does not lawfully support the Commission's decision to apply a WEFA escalator in the present case.

The Commission notes that it proposed an adjustment to CIPS' projected test-year wage increases through witness Robert Konzelmann, an accountant in the Commission's auditing section. The Commission concedes that CIPS' witness took issue with the Konzelmann's adjustments. However, the Commission notes that on rebuttal testimony, Konzelmann testified that CIPS' witness:

> "seems to find it unnecessary to support proposed payroll increases with detailed documentation. I have requested a good deal of information regarding payroll and proposed increases, only to be referred to previously referenced Company summary exhibits and responses that certain records are not kept, and

therefore the information is impossible to obtain. In my direct testimony, I presented ICC EX 3.02-G and 3.02-E which reconstructs Company payroll expense based on the best information available to Staff. In rebuttal testimony, Mr. Bachman states that Staff's adjustment ignores management's decisions and appears to be wholly arbitrary. Yet, he makes no attempt to point out what he believes is wrong with my calculations, nor what is missing to cause my calculation to be so much different than the Company's proposed expense."

The Commission claims that, based on the foregoing staff testimony, it found that Konzelmann's adjustment to the test-year wage increases should be adopted. The Commission further argues that it merely cited *Commonwealth Edison Co.*, ICC No. 90—0169, to show that it previously considered WEFA economic forecast charts to be recognized wage forecasts which may be reasonably used for rate making forecasts.

■■ The fact that the order refers to *Commonwealth Edison Co.*, ICC No. 90—0169, merely indicates that the Commission had relied on WEFA forecasts previously and was not the sole basis for the Commission's order as contended by CIPS. Both CIPS and the Commission staff presented evidence regarding the appropriateness of the WEFA forecasts and CIPS' projections. The Commission, after considering the conflicting testimony, found that the use of the WEFA escalator was appropriate. As there was significant evidence specifically mentioned by the Commission in its order supporting its decision to use the WEFA escalator, we cannot say that the findings or evidence was inadequate.

#### IV. EXCLUSION OF UNAMORTIZED RATE CASE EXPENSES FROM THE RATE BASE

Next, CIPS challenges the Commission's decision to exclude unamortized rate case expenses from the rate base. The costs incurred by a utility to prepare and present a rate case are properly recoverable as an ordinary and reasonable cost of doing business. (*Du Page Utility Co. v. Illinois Commerce Comm'n* (1971), 47 Ill. 2d 550, 561, 267 N.E.2d 662, 668.) Because rate case expenses do not routinely occur every year, such expenses are ordinarily amortized over an appropriate period of time. In the present case, the amortization proposed by CIPS, and adopted by the Commission, was five years. CIPS claims that as a result of the amortization of this item, CIPS incurred carrying costs associated with the funds invested in the amortized balance of the expenses. For example, in the first year that the rates ap-

proved in this case are effective, CIPS claims that it would have an opportunity to recover one-fifth of its rate case expenses. At the end of that year, however, 80% of the expenses would remain "unamortized," *i.e.*, unrecovered. Over five years CIPS will recover 100% of its rate case expenses but not earn a rate of return on the funds while they were unamortized. CIPS therefore claims that it incurs a "carrying cost" equal to the cost of capital associated with an investment in the unrecovered balance of the rate case expense. CIPS claims that to provide for an opportunity to recover those carrying costs, CIPS made adjustments to both its electric and gas rate bases to include the average unamortized balance of the rate case expense associated with a five-year amortization period, thus allowing it to earn a rate of return on the funds invested in the rate case.

CIPS argues that the Commission arbitrarily, and without supporting analysis or findings of fact, adopted a proposal of its staff to exclude the unamortized balance of rate case expenses from the rate base. CIPS argues that the effect of the Commission's decision is to deprive CIPS of an opportunity to recover its total rate case cost (specifically, that portion which consists of the carrying costs on its investment in unamortized rate case expenses) and, therefore, to deprive it of an opportunity to earn the rate of return allowed in this proceeding. Accordingly, CIPS contends that the Commission's decision is contrary to Illinois law, which requires the Commission to set rates sufficient to provide for recovery of expenses and a reasonable return to investors on their investment. (See *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n* (1953), 414 Ill. 275, 286, 111 N.E.2d 329, 335.) CIPS also claims that the Commission's decision is contrary to section 1—102(a)(iv) of the Act, which declares that one goal of regulation under the Act shall be to ensure that "tariff rates for the sale of various public utility services are authorized such that they *** allow utilities to recover the total costs prudently and reasonably incurred." Ill. Rev. Stat. 1991, ch. 111⅔, par. 1—102(a)(iv).

In its order, the Commission acknowledged CIPS' arguments that it should have an opportunity to recover its carrying costs associated with funds invested in the unamortized balance of the expenses and that exclusion of such expenses from the rate base would deprive CIPS of an opportunity to earn a rate of return allowed by the Commission. The order also noted that a staff witness found that excluding unamortized rate case expenses from the rate base was appropriate because "both shareholders and ratepayers benefit from the expenses." (Commerce Commission's order, at 58.) The order concludes that excluding unamortized rate case expenses was "consistent

with past Commission orders including CIPS' last gas rate case [(Docket No. 90—0072)] and CILCO Docket No. 90—0127." Commerce Commission's order, at 59.

The Commission maintains that by its order it decided to continue its existing policy of excluding unamortized rate case expenses from the rate base. The Commission argues that a "utility has the burden of proving that any operating expense for which it seeks reimbursement directly benefits the ratepayers or the services which the utility renders." (*Candlewick Lake Utilities Co. v. Illinois Commerce Comm'n* (1983), 122 Ill. App. 3d 219, 227, 460 N.E.2d 1190, 1196.) The Commission maintains that the order here requires a sharing of the unamortized rate case expense between the shareholders and the ratepayers. The Commission concludes that the unamortized balance of rate case expense is not an asset which directly contributes to the generation of electricity or the supply of gas, so it is reasonable that ratepayers should not be required to pay a return on that balance.

■■ We find that the Commission's decision to exclude unamortized rate case expenses from the rate base was proper, supported by adequate findings of fact, and supported by substantial evidence in the record. Evidence was presented by staff witnesses indicating that both shareholders and ratepayers benefit from the rate case expenses and that such expenses do not contribute directly to the generation of electricity or the supply of gas. Staff witnesses testified that it was appropriate to exclude unamortized rate case expenses from the rate base, and the order cites past Commission orders which clearly exclude such expenses. The Commission found that it was reasonable to have the shareholders as well as the ratepayers contribute to this expense. Here, the only contribution that the shareholders are forced to make is the carrying costs (the time value of money) associated with the unamortized rate case expense. CIPS will recover the entire principal that it invested in the rate case. In light of the evidence presented by staff testimony and the findings made by the Commission, we cannot say that the Commission's decision to exclude the rate case expenses from the rate base was improper.

### V. INCLUSION OF THE CONSTRUCTION COSTS OF THE PRECIPITATOR IN THE RATE BASE

The first issue raised by the intervenor CUB is a challenge to the Commission's decision not to require an audit of the costs associated with the construction of the Meredosia Unit III Precipitator before such costs were included in the CIPS rate base. CIPS requested that the Commission reflect its investment in a precipitator in the rate

base. The precipitator is used to comply with the opacity standards under the Illinois Environmental Protection Agency (IEPA) and Pollution Control Board regulations. The precipitator would increase the net capacity of the unit by 20% (from 184 megawatts to 220 megawatts) and was expected to be put into service in late 1992. The Commission allowed this investment into the rate base without an audit. Commerce Commission's order, at 26.

CUB argues that the cost of the precipitator "shot upward." CUB claims that in August 1990 CIPS estimated the cost of the new precipitator as $12,295,000; by the fall of 1991, the revised estimate was $29.5 million. The Commission and CIPS indicate that the cost did not increase dramatically. The order notes that the initial estimate was part of detailed analyses by Joy Technologies and Sargent & Lundy. (Commerce Commission's order, at 26.) Several alternatives were presented and CIPS claims that it chose the least-cost alternative. The analyses examined only direct costs involved in the construction. Indirect costs (such as taxes, et cetera) were not included in the analyses. Hence, the estimate of direct cost was approximately $12.3 million but the estimate of direct and indirect costs prepared in January 1991 was $23.5 million and was ultimately updated to $29.5 million. Accordingly, the Commission found in its order that the costs did not increase dramatically.

CIPS argues that the precipitator is not being constructed to increase capacity but to assure compliance with environmental regulations. CIPS notes that the full capacity of the Meredosia Unit III is 220 megawatts. However, according to CIPS, there was a limitation on generation from that unit which had been imposed by the IEPA. This limitation was deemed necessary to assure that the unit complied with the IEPA's particle standards. CIPS claims that as a result of the limitation, the net capacity of the unit had been derated by 36 megawatts (from 220 megawatts to 184 megawatts). According to CIPS, it was anticipated that construction of the replacement precipitator would permit CIPS to comply with the particle standards under full load operations, thereby permitting the restoration of the 36 megawatts derating.

CUB argues that the Commission violated section 9—213 of the Act (Ill. Rev. Stat. 1991, ch. 111⅔, par. 9—213) by allowing the cost of the precipitator into the rate base without an audit. That section provides:

"The cost of new electric utility generating plants and significant additions to electric utility generating plants shall not be included in the rate base of any utility unless such cost is rea-

sonable. Prior to including the cost of plants or additions to utility plants in the rate base, the Commission shall conduct an audit of such costs in order to ascertain whether the cost associated with the new generating plant or the addition to electric utility generating plant is reasonable." (Ill. Rev. Stat. 1991, ch. 111²/₃, par. 9—213.)

The legislature "did not codify a definition of the term 'significant additions' but left the determination of whether an addition is significant and whether an audit of those projects should be conducted to the sound discretion of the Commission." *BPI*, 146 Ill. 2d at 220, 585 N.E.2d at 1050.

The Commission, in its order, indicated that an audit was not required because the precipitator was a "replacement" of the existing precipitator and not an "addition." (Commerce Commission's order, at 26.) CUB claims that the intent of the legislation was to insure that no unreasonable construction costs are passed on to the consumers. CUB argues the only way to insure reasonableness is through an audit and that the protection against unreasonable expenditures is as necessary for replacements as it is for additions because both involve expenditures which the company seeks to include in the rate base.

■ *BPI II* clearly holds that not all projects conducted at generating plants are additions within the meaning of section 9—213 of the Act. (*BPI*, 146 Ill. 2d at 220, 585 N.E.2d at 1050.) By its terms the audit requirement of section 9—213 of the Act only applies to new generating plants and significant "additions." (Ill. Rev. Stat. 1991, ch. 111²/₃, par. 9—213.) It is well settled that words in a statute are to be given the meaning that they have in ordinary usage. (*Coldwell Banker Residential Real Estate Services of Illinois, Inc. v. Clayton* (1985), 105 Ill. 2d 389, 396, 475 N.E.2d 536, 539.) The term "addition" is clear and unambiguous in the context of section 9—213 of the Act. We find the Commission's interpretation of section 9—213 of the Act, *i.e.*, that the audit requirement applies to additions but not to replacements, was proper. Accordingly, the inclusion of the construction costs of the precipitator in the rate base without an audit was proper and supported by the evidence.

Because the audit is not required here does not mean there is no protection for ratepayers. Section 9—211 of the Act provides: "The Commission, in any determination of rates or charges, shall include in a utility's rate base only the value of such investment which is both prudently incurred and used and useful in providing service to public utility customers." (Ill. Rev. Stat. 1991, ch. 111²/₃, par. 9—211.) In-

deed, the Commission and its staff routinely review and evaluate utility construction programs.

## VI. TREATMENT OF EXCESS ACCUMULATED DEFERRED TAXES

Next, CUB challenges the Commission's decision to return excess accumulated deferred income taxes (ADITs) over the remaining useful life of the assets which gave rise to the excess deferred taxes. CIPS accumulated a reserve of ADITs which is $15,698,000 in excess of the amount CIPS needs to pay in future tax obligations. This resulted from CIPS having collected Federal income taxes from ratepayers at the rate of 45% before 1987 and presently having to pay Federal income tax at the decreased tax rate of 34%. Due to the reduction in the corporate rate, the amount of ADITs that the company recorded in the years prior to the Tax Reform Act of 1986 (Pub. L. No. 99–514, 100 Stat. 2085 (1986)) overstates the amount of taxes the company will be required to pay in the future. That is, because the company overestimated the amount of taxes it would pay in future years, the company has charged ratepayers more for *deferred* taxes than the company will actually have to pay the Federal government. (See *BPI*, 146 Ill. 2d at 257, 585 N.E.2d at 1067.) Because excess ADITs are not needed to pay CIPS' future tax obligations, the Commission must determine how they are to be treated.

CUB contends that the Commission should have adopted its proposal to return the ADITs over three years. In its order, the Commission adopted the "average setup method," which it described as follows:

> "The evidence shows that, using the 'average setup method,' the Company already feeds back accumulated excess deferred taxes over the remaining life of the assets which gave rise to those deferred taxes. This method distributes the tax benefits associated with property to the ratepayers who benefit from and pay for that property. Moreover, the feedback of excess deferred taxes over the remaining useful life of the related assets mitigates the possible need for a rapid amortization of 'understated' deferred taxes in the event of a future increase in the statutory tax rate." (Commerce Commission's order, at 80.)

The Commission in its order also indicated that CUB's proposal to return the ADITs over a three-year period was insensitive to the need for rate stability.

The Illinois Supreme Court has upheld the Commission's decision to return unamortized ADITs over three years, holding " 'a three-year flowback period is reasonable because it directly reimburses

those customers who have contributed to the excess ADITs.' " (*BPI II*, 146 Ill. 2d at 258, 584 N.E.2d at 1068, quoting *Commonwealth Edison Co.* (Mar. 8, 1991), ___ Ill. Com. Comm'n ___, ___ (No. 90—0169, slip op. at 23).) The court stated:

> "We agree with the Commission that it is fair and reasonable to return these excess ADITs to the ratepayers who actually paid this money to the company. Based on its review of the evidence, the Commission decided that the best way to achieve this end was to amortize the amount over three years. We believe that the Commission's findings on this issue were fair and reasonable as well as supported by the evidence and sound reasoning." *BPI*, 146 Ill. 2d at 258-59, 585 N.E.2d at 1068.

CUB contends that the Commission departed from its policy of returning ADITs over a three-year period and gave no reason for the departure. According to CUB, the Commission " 'may not depart, *sub silentio*, from its usual rules of decision to reach a different, unexplained result in a single case.' " (*Commonwealth Edison Co. v. Illinois Commerce Comm'n* (1988), 180 Ill. App. 3d 899, 908, 536 N.E.2d 724, 730, quoting *National Labor Relations Board v. International Union of Operating Engineers, Local 925* (5th Cir. 1972), 460 F.2d 589, 604.) Furthermore, CUB argues that when "an agency action *** represents an abrupt departure from past practice," the Commission decision is not entitled to the deference ordinarily afforded Commission findings of fact. (*Commonwealth Edison Co.*, 180 Ill. App. 3d at 909, 536 N.E.2d at 730.) CUB contends that the Commission's decision, here, to return the excess ADITs by way of the "average setup method" was without supporting analysis or findings of fact.

CUB also notes that, previously, the Commission has rejected the suggestion that it "flow back" the excess ADITs over the useful life of the property (see *Commonwealth Edison Co.* (Mar. 8, 1991), ___ Ill. Com. Comm'n ___ (No. 90—0169)) and the Illinois Supreme Court rejected a challenge to the Commission's order on appeal, stating:

> "The Commission rejected Edison's proposal to amortize the second category of excess ADIT over the remaining useful lives of the underlying assets. Instead, the Commission found that 'a three-year flowback period is reasonable because it directly reimburses those customers who have contributed to the excess ADITs.' The excess ADIT represents money Edison has already collected from ratepayers to cover future income tax expenses which the company will not incur. We agree with the

Commission that it is fair and reasonable to return these excess ADITs to the ratepayers who actually paid this money to the company. Based on its review of the evidence, the Commission decided that the best way to achieve this end was to amortize the amount over three years. We believe that the Commission's findings on this issue were fair and reasonable as well as supported by the evidence and sound reasoning." (*BPI*, 146 Ill. 2d at 258-59, 585 N.E.2d at 1068.)

In light of *BPI II*, CUB urges this court to reverse the Commission's treatment of the excess ADITs.

The Commission argues that a careful reading of its order in *Commonwealth Edison Co.* (Mar. 8, 1991), ___ Ill. Com. Comm'n ___ (No. 90—0169), and the supreme court's review of it in *BPI II* reveals that the Commission did not establish a general practice or policy of returning excess accumulated deferred taxes to ratepayers over a three-year period. The Commission contends that the three-year period to flow through excess accumulated deferred taxes to ratepayers in *BPI II* resulted from the particular facts of that case. The Commission notes that, in *BPI II*, the supreme court found that the Commission's decision to adopt the adjustment for excess unprotected deferred taxes was supported by the record in that proceeding. (*BPI*, 146 Ill. 2d at 258-59, 585 N.E.2d at l068.) The Commission contends that *BPI II* does not mandate a particular treatment of excess unprotected deferred taxes in all cases.

The Commission also notes that the method CIPS used to flow back excess deferred taxes was a method the Commission specifically approved and found to be "fair and equitable to both utility ratepayers and stockholders." (*Re Accounting Treatment of the Deferred Tax Reserve* (1985), 69 Pub. Util. Rep. 4th 353, 364.) *Re Accounting Treatment of the Deferred Tax Reserve*, which approved the average setup method, was a proceeding involving all Illinois public utilities subject to Commission jurisdiction, including CIPS, and was initiated for the express purpose of investigating the appropriate methods of treating excess accumulated deferred taxes resulting from a change in the statutory income tax rates.

■ The Commission's decision to permit continued use of the average setup method by CIPS is fully supported by the record. A court of review is not to reweigh evidence or make an independent determination of the facts; rather, our sole function here is to ascertain whether the final decision of the administrative agency is just and reasonable in light of the evidence presented. (*Markowski v. Edgar* (1986), 151 Ill. App. 3d 176, 180, 502 N.E.2d 1304, 1307; *Sheldon v.*

*Edgar* (1985), 131 Ill. App. 3d 489, 491, 475 N.E.2d 956, 957.) In light of the findings that the average setup method returns excess ADITs over the remaining life of the assets to the ratepayers who benefit from and pay for that property and mitigates against the possible need for a rapid amortization of "understated" deferred taxes in the event of a future increase in the statutory increase, and that CUB's proposal was insensitive to the need for rate stability, we cannot say that the Commission's decision to adopt the average setup method was improper.

### VII. APPROVAL OF CIPS' CAPITAL STRUCTURE

CUB next argues that the Commission erred in its decision to allow temporary cash investments (TCIs) to be included in CIPS' capital structure.

The Illinois Supreme Court explained how the Commission establishes rates for public utilities as follows:

"In establishing the rates that a public utility is to charge its customers, the Commission bases the determination on the company's operating costs, rate base, and allowed rate of return. A public utility is entitled to recover in its rates certain operating costs. A public utility is also entitled to earn a return on its rate base, or the amount of its invested capital; the return is the product of the allowed rate of return and rate base. The sum of those amounts—operating costs and return on rate base—is known as the company's revenue requirement. The components of the ratemaking determination may be expressed in 'the classic ratemaking formula R (revenue requirement) = C (operating costs) + Ir (invested capital or rate base times rate of return on capital).' (*City of Charlottesville, Virginia v. Federal Energy Regulatory Comm'n* (D.C. Cir. 1985), 774 F.2d 1205, 1217, citing T. Morgan, Economic Regulation of Business 219 (1976).) The same formula is used by the Commission in ratemaking determinations for Illinois. The revenue requirement represents the amount the company is permitted to recover from its customers in the rates it charges. Ratemaking is done in the context of a test year ***." *Citizens Utilities Co. v. Illinois Commerce Comm'n* (1988), 124 Ill. 2d 195, 200-01, 529 N.E.2d 510, 512-13.

The Commission argues that a utility's "capital structure" is used to aid it in determining a utility's rate of return. The Louisiana Supreme Court explained the general method by which a utility's capital structure is used to calculate rate of return as follows:

"The generally accepted method of computing the fair rate of return is the 'cost of capital' approach. *** The rate making authority examines the utility's capital structure to identify the sources of the utility's capital. The utility might have a capital structure consisting of fifty per cent debt, fifteen per cent preferred stock and thirty-five per cent common stock. The regulatory agency then ascertains the cost of each component: the cost of debt *** could be six per cent; the cost of preferred stock *** might be eight per cent ***. Using these preliminary computations, the overall cost of capital may be calculated as follows:

| | | | |
|---|---|---|---|
| Debt | 50% at 6% | = | .030 |
| Preferred Stock | 15% at 8% | = | .012 |
| Common Stock | 35% at 12% | = | .042 |
| | | | .084 |

The fair rate of return is essentially the same as the overall cost of capital. Sometimes regulatory agencies will adjust this percentage figure ***." *South Central Bell Telephone Co. v. Louisiana Public Service Comm'n* (La. 1977), 352 So. 2d 964, 970.

This method of calculating rate of return is sometimes referred to as the "weighted cost of capital" approach, whereby the cost of the individual capital components are weighted in relation to their proportion to the total capital structure. The total sum of these weighted component costs is the overall allowed rate of return on the rate base. The Commission claimed that it followed this general approach in the instant case in determining CIPS' overall rate of return for its gas and electric operation.

CUB claims that the Commission illegally allowed CIPS' financial ventures into nonregulated areas to affect its regulated operations and burden ratepayers. According to CUB, the Commission violated section 9—230 of the Act (Ill. Rev. Stat. 1991, ch. 111²/₃, par. 9—230) by approving a cost of capital inflated by the inclusion of CIPS' temporary cash investments in the amount of common equity included in the capital structure. That section provides:

"In determining a reasonable rate of return upon investment for any public utility in any proceeding to establish rates or charges, the Commission shall not include any incremental risk or increased cost of capital which is the direct or indirect result of the public utility's affiliation with unregulated or nonutility companies." Ill. Rev. Stat. 1991, ch. 111²/₃, par. 9—230.

CUB's witness, Robert Damron, recommended that $88,257,000 identified as TCIs be removed from the equity component of the company's capital structure. CUB claims that this was required to eliminate the effect of CIPS using equity funds to fund nonregulated operations. CUB argues that the Commission erred in adopting a capital structure which funded $88,257,000 in TCIs where the evidence showed that these TCIs were not being used by CIPS to fund regulated, utility operations, but were short-term investments accumulated for transfer to CIPSCO, CIPS' nonregulated parent company. CUB argues that during the reorganization of CIPS into CIPSCO and CIPS, CIPS transferred $70 million of common stock to CIPSCO and loaned CIPSCO $3 million. CIPSCO in turn formed a subsidiary, CIPSCO Investment Company, to manage CIPSCO's nonregulated assets. CUB claims that CIPSCO Investment Company's initial source of funds is CIPSCO, which obtained its funds from CIPS.

CUB notes that prior to the formation of CIPSCO, CIPS retained earnings and invested them in short-term marketable securities. In November 1990, after the formation of CIPSCO, CIPS transferred $70 million into marketable securities and cash to CIPSCO. CUB claims that this transfer resulted in a $70 million decrease in CIPS' overall capitalization and a $67,604,323 reduction in TCIs (97% of the total amount transferred to CIPSCO). The transfer, according to CUB, reduced the percentage of common equity in its capital structure from 51.1% to 48%.

CUB claims that the record is clear that TCIs have grown substantially since 1986 and the only source of funding for these investments is equity or retained earnings. CUB notes that the order refers to the contention that "it is not evident that the cash will be used for non-utility purposes." (Commerce Commission's order, at 93.) However, CUB claims that neither CIPS' witnesses nor the staff witnesses testified about what these TCIs were actually used for.

CUB claims that including TCIs in the capitalization of CIPS inflates the cost of capital by increasing the amount of money on which CIPS is entitled to earn a rate of return. CUB claims that the inclusion of the TCIs funded by retained earnings drives up the equity ratio in the capital structure. This, according to CUB, causes the overall cost of capital to be higher, distorts the total structure, and causes the actual capital structure to be unrepresentative of the capitalization actually funding the rate base. CUB concludes that the Commission allowed CIPS to earn an excessive return by allowing it to include funds used for nonregulated operations in CIPS' capitalization.

CUB claims this is a violation of section 9—230 of the Act because it increases the rate of return consumers must pay the company as a "direct or indirect result of the public utility's affiliation with unregulated or nonutility companies." (Ill. Rev. Stat. 1991, ch. 111²/₃, par. 9—230.) Accordingly, CUB claims that the Commission's determination of CIPS' capital structure and rate of return should be reversed and remanded.

The Commission claims that its decision to reject CUB's proposal to remove TCIs from CIPS' common equity component of its capital structure is supported by evidence that inclusion of the TCIs has no impact on CIPS' cost of capital. According to the Commission, CUB assumes that CIPS' TCIs can be traced to common equity, and that the TCIs will only be used to fund nonregulated operations. The Commission notes that CIPS provided testimony that its capital structure represents a pool of invested capital which supports its overall investment in electric, gas and nonutility operations, and that one cannot trace capital from its source to its use.

CIPS witness John R. Curtis testified that the TCIs could be used to purchase a utility plant, and staff witness Alan S. Pregozen testified that CIPS' TCIs could be used to purchase a utility plant, make possible rate refunds associated with docket No. 87—0542 (a proceeding initiated by the Commission to investigate the effects on CIPS' rates under the Tax Reform Act of 1986 (and the Commission notes that CIPS is currently recording a liability for rate refunds in the amount of $66 million until docket No. 87—0542 is concluded)), or pay dividends—none of which necessarily affects CIPS' common equity balance.

In its order, the Commission specifically adopted a projected 1992 capital structure that will actually be supporting electric and gas rate base during the future test year:

> "The Commission finds that there is no basis for reducing the common equity balance reflected in that projected test year capital structure as suggested by CUB and supported by OPC and the AG. The evidence supports the conclusion that the Staff's projected 1992 capital structure represents the capital structure which will actually be supporting electric and gas rate base during the test year." (Commerce Commission's order, at 94.)

Consequently, CUB's arguments regarding past transactions of CIPS which are already accounted for in determining the projected 1992 capital structure are irrelevant.

■ We conclude that the Commission provided sufficient findings and analysis to support its conclusions. The mere fact that CUB's witnesses offered testimony that conflicted with that of CIPS' witnesses and the Commission staff is insufficient to reverse the Commission's order. The credibility of expert witnesses and the weight to be given to their testimony are matters for the Commission to decide as finder of fact. A reviewing court may not substitute its interpretation of the evidence for that of the Commission. (*People ex rel. Hartigan v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 120, 142, 510 N.E.2d 865, 874.) We find that the Commission's determination of CIPS' capital structure was proper, supported by adequate findings of fact, and supported by substantial evidence in the record.

## VIII. CIPS' Gas Rate Structure

Finally, CUB challenges the commission's decision to alter the gas rate structure by approving an increase in the residential service charge and adopting a "declining block rate."

The Commission approved an increase in the residential service charge, which consumers pay regardless of the amount of gas usage, from $6.56 to $7, and a declining block charge, which results in a per-therm charge for the first 50 therms of use that is approximately 50% greater than the charge for use over 50 therms. Previously, the residential customers paid the same per-therm charge regardless of the number of therms used.

CUB argues that ordinarily the Commission sets rates based on long-run marginal cost service studies. (See *Governor's Office of Consumer Services v. Illinois Commerce Comm'n* (1991), 220 Ill. App. 3d 68, 580 N.E.2d 920.) However, CUB contends that here the Commission changed the rate structure so that the smallest customers saw the greatest increase by increasing the natural gas service charge and instituting a declining block rate without the benefit of a gas marginal cost study in the record.

In its order, the Commission referred to a marginal cost study found in CIPS' last rate filing (see *Central Illinois Public Service Co.* (Nov. 28, 1990), ____ Ill. Com. Comm'n ____ (No. 90—0072)) to support its change in the residential rate design. CUB argues that the study upon which the Commission relied was not in the record in this docket, its author was not subject to cross-examination, and no party offered rebuttal testimony to it. CUB contends that the Commission's reliance on "nonrecord data" violated section 10—103 of the Act, which states: "[A]ny finding, decision or order made by the Commission shall be based exclusively on the record for decision in the case,

which shall include only the transcript of testimony and exhibits together with all papers and requests filed in the proceeding ***." (Ill. Rev. Stat. 1991, ch. 111⅔, par. 10—103.) Additionally, CUB contends that such reliance on nonrecord data violated sections 10 through 15 of the Illinois Administrative Procedure Act (see Ill. Rev. Stat. 1991, ch. 127, pars. 1010 through 1015) and the due process rights of CUB and residential customers. CUB also argues that there is absolutely no record evidence to support the declining block rate which places a greater cost burden on the first 50 therms of usage than on usage over 50 therms.

The Commission argues that the rate design changes it adopted were fully supported by the record. The Commission's order notes that CIPS' rate design was recently considered in CIPS' last gas rate filing. There, CIPS was not allowed to increase residential customer service charges to the full cost of $10.55 established by a gas marginal cost of service study. The Commission adopted the recommendation of staff that CIPS not be allowed to increase residential rates to the full cost in the interest of "gradualism." Staff agreed in docket No. 90—0072 (CIPS' immediately preceding gas rate case) that in the company's next rate case (which is the present case) these rates should be moved further towards actual costs. CUB was a party to that case, presented testimony therein, and cross-examined company and Commission staff witnesses. See *Central Illinois Public Service Co.* (Nov. 28, 1990), \_\_\_ Ill. Com. Comm'n \_\_\_, \_\_\_ (No. 90—0072, slip op. at 34).

Here, CIPS witness Robert J. Mill proposed an increase in the residential customer charge (to $8.50) midway between the current charge and the marginal customer costs. Staff witness Scott R. Swanson agreed that the recent calculation of marginal cost in CIPS' immediately preceding rate case probably reflected costs and was appropriate for use in this proceeding. Swanson, however, recommended that the increase in residential customer service charges be limited to 7%, once again in the interest of gradualism and rate continuity. Furthermore, the implementation of a declining block rate was supported by testimony from both Mill and Swanson.

It has long been recognized that judicial deference to the Commission's judgment is especially appropriate in the area of setting rates. (*Iowa-Illinois Gas & Electric Co.*, 19 Ill. 2d at 442, 167 N.E.2d at 417.) Because of its complexity and need to apply informed judgments, rate design is uniquely a matter for the Commission's discretion. See *Cerro Copper Products v. Illinois Commerce Comm'n* (1980), 83 Ill. 2d 364, 370-71, 415 N.E.2d 345, 348-49.

██ The record contained testimony regarding the marginal customer cost study submitted in CIPS' immediately preceding gas rate proceeding. Staff witness Swanson and CIPS' witness Mill testified at length regarding the increase in customer charges. Similarly, substantial evidence supported the adoption of the declining block rate, including testimony by Swanson and Mill.

Therefore, we find that the Commission relied on testimony clearly in the record for its decision to adopt the increase in residential service charge and a declining block rate. As rate design is uniquely a matter for the Commission's discretion and in light of the substantial evidence in support of its decision, we find the increase in the residential service charge and the adoption of the declining block rate proper.

IX. CONCLUSION

For all of the above reasons, we affirm.

No. 4—92—0459, Affirmed.
No. 4—92—0472, Affirmed.

COOK and GREEN, JJ., concur.