A. FINKL AND SONS COMPANY *et al.*, Petitioners, v. ILLINOIS COMMERCE COMMISSION *et al.*, Respondents.

First District (2nd Division) Nos. 1—91—3854, 1—91—3869, 1—91—3871, 1—91—3899 cons.

Opinion filed June 8, 1993.—Rehearing denied September 10, 1993.

Lueders, Robertson & Konzen, of Granite City (Edward Fitzhenry, Eric Robertson, and Randall Robertson, of counsel), for petitioner A. Finkl & Sons Company.

Susan L. Satter, of Chicago, for petitioner Citizens Utility Board.

Cynthia L. Cacciatore, Special Assistant Attorney General, of Chicago, for respondent Illinois Commerce Commission.

Sidley & Austin, of Chicago (Sarah J. Read, Gerard D. Kelly, and Anastasia M. Polek, of counsel), for respondent Commonwealth Edison Company.

Fred Zalcman, of Springfield, for respondent Illinois Department of Energy and Natural Resources.

Kelly R. Welsh, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon, and Alan Neff, Assistant Corporation Counsel, of counsel), for respondent City of Chicago.

JUSTICE HARTMAN delivered the opinion of the court:

This review proceeds under sections 10—113 and 10—201 of the Public Utilities Act (Ill. Rev. Stat. 1989, ch. 111²/₃, pars. 10—113, 10—201 (now 220 ILCS 5/10—113, 10—201 (West 1992)) (section 10—201) (Act)) and Supreme Court Rule 335 (134 Ill. 2d R. 335), from a final order of the Illinois Commerce Commission (Commission), which allowed Commonwealth Edison (Edison) to recover costs associated with demand-side management (DSM) programs through a rider, designated "Rider 22." Illinois Industrial Energy Consumers (IIEC) and Citizens Utility Board (CUB) appeal.

The issues presented for review are whether (1) IIEC and CUB have standing to pursue this review; (2) the Commission violated the

prohibition against single-issue ratemaking; (3) the Commission acted beyond its jurisdiction in approving the rider as an incentive to Edison to comply with the law; (4) the Commission violated the Public Utilities Act (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 1—101 *et seq.* (now 220 ILCS 5/1—101 *et seq.* as amended (West 1992)) (Act)) by allowing Edison to charge consumers for "lost revenues"; (5) the Commission violated the prohibition against retroactive rule making; (6) the Commission's approval of Rider 22 is a violation of its own rules and the laws pertaining to use of a test year; and (7) the Commission erred in not requiring a cap on cost recovery in the rider.

A brief consideration of policy and procedural history is necessary to an understanding of the issues presented in this review. Section 8—402 of the Act (Ill. Rev. Stat. 1989, ch. 111 2/3, par. 8—402 (section 8—402)) requires the Commission to adopt long-range energy plans for both the State as a whole and for each energy service utility in order to effectuate "least cost" policies of the State. Every three years, the Department of Energy and Natural Resources (DENR) is required to prepare and submit proposed utility energy plans for Illinois. The utilities also prepare and submit individual company plans for Commission approval.[1] Evidentiary hearings are to be held, and the Commission must either adopt or modify the plans submitted. The Commission must select the plan, and components thereof, which will result in the greatest likelihood of providing adequate, efficient, reliable and environmentally safe energy services at the least cost to consumers and which will utilize, to the fullest extent practicable, all economical sources of conservation, renewable resources, cogeneration and improvements in energy efficiency as the primary sources of new energy supply. To the fullest extent possible, the plans adopted for each utility are to be consistent with the statewide plan.[2] Ill. Rev. Stat. 1989, ch. 111²/₃, par. 8—402.

Where the Commission determines, as a result of the hearings, that a utility's existing or planned programs or policies inhibit or do not fully ensure the economical utilization of conservation, renewable

---

[1] At all relevant times, the period within which to submit the proposed plans was two years. It was not until 1992 that it became three years.

[2] As Edison notes, a plan proposing demand-side resources over supply-side resources is preferred. Supply-side resources are those that increase the amount of electricity available for consumption in Illinois or in the service territory of each utility. Demand-side resources are those that are derived from implementation of demand-side programs, which reduce the use of electricity and influence the distribution of a utility's total electricity demand over time. 83 Ill. Adm. Code §440.100 (1991).

resources, cogeneration or improvements in energy efficiency, it "shall" revise the plan as necessary and order the utility to implement the program or policies in cooperation with the DENR. Implementation by a utility of such additional programs or policies as ordered by the Commission entitles the utility to recover reasonable costs through the ratemaking procedures outlined in the Act. Ill. Rev. Stat. 1989, ch. 111²/₃, par. 8—402.

On October 6, 1989, the Commission adopted the first statewide plan, setting forth in detail how utilities are to develop the capability to use the demand-side resources that are favored, consistent with section 8—402. The Commission directed the utilities to "begin to build the capability to turn potential demand resources into available resources consistent with section 8—402 ***. This process should include technical and market research and development, pilot programs, and marketing tests designed to gather information, test incentive designs, and assess and build delivery mechanisms."

The Commission also recognized that utilities should recover costs they incur with demand-side program analyses and were directed to develop proposals for the recovery of "prudently-incurred" costs associated with analysis, design and implementation of demand-side programs. The Commission found it premature to articulate a uniform policy with respect to DSM cost recovery and lost revenues.

The statewide plan also addressed the recovery of a particular cost associated with demand-side programs due to lost revenue, which are revenues that the utility would earn but for DSM capability building activities, referred to as a potential barrier to implementing demand-side programs. The utilities were directed to include in their least cost plan a proposal to reduce this barrier.

Witnesses during hearings on Rider 22 explained, in part, that: "The lost earnings due to implementing such a demand[-]side resource prematurely are a real cost of the decision to do so." Further, "[t]he recovery of Lost Revenues allows utilities to recover revenues lost through the implementation of capability building pilot programs that the Commission has found to be in the public interest." Also, "demand-side resources provide much lower earnings than supply-side resources, unless profits lost as a result of decreased sales due to demand-side management ['DSM'] are offset in some manner."

Edison submitted its first individual company electric energy plan on January 8, 1990, in which it charted its capability to design, implement and evaluate demand-side resources. Edison addressed the issue of how to best recover the costs associated with its DSM and proposed that its cost of building capability in the design, evaluation and

implementation of demand-side resources be recovered by the use of a cost recovery mechanism called a rider, which is a form of tariff that modifies an otherwise applicable standard rate under specific circumstances.

The Commission confirmed the use of a rider as an appropriate cost recovery mechanism in an order dated December 12, 1990 (Illinois Commerce Commission, Illinois Commerce Commission No. 90—0038 (Dec. 12, 1990) (Docket No. 90—0038)), asserting that the absence of a cost recovery mechanism for DSM presents substantial barriers to least cost energy planning, which should be reduced or minimized if possible.

Pursuant to the Commission's order, on January 3 and 8, 1991, Edison met with interested parties to discuss the proposed cost-recovery rider. Prior to these "workshops" Edison circulated a proposed rider for review to all those entities participating in the prior proceeding. Edison received written comments on the proposed rider from the Commission staff, DENR, the City of Chicago, IIEC, the Attorney General and the Office of the Public Counsel (OPC).

Following the workshop, Edison, DENR, the Cook County State's Attorney's office, the City of Chicago and Low-Income Residential Consumers entered into a stipulation agreeing that Rider 22 be placed into effect without suspension or hearing. IIEC sought modification and objected to the recovery of costs on a per-kilowatt basis and raised other objections. CUB did not actively participate in this stage of the proceedings.

On January 11, 1991, Edison filed with the Commission proposed Rider 22, its supplemental statement and a copy of the stipulation. The Commission nevertheless suspended the rider and held evidentiary hearings. On October 2, 1991, the Commission approved Rider 22 with minor modifications, finding:

> "A rider is the most appropriate method for the recovery of [demand-side] costs because the actual expenses are difficult to predict in advance, especially given the fact that neither the Commission nor Edison has extensive experience in the implementation of [demand-side] analysis and programs, and may fluctuate from year to year and from month to month."

The Commission asserted that use of a rider would be more accurate than recovering such costs through an adjustment of base rates, noting also that Edison's schedule of rates currently includes several riders which allocate the costs, or savings, of a wide variety of items.

IIEC and CUB filed petitions for rehearing, which the Commission denied. This petition for review followed.

Our jurisdiction to review Commission orders is set forth in section 10—201 of the Act. Section 10—201(d) of the Act requires the Commission's findings and conclusions on questions of fact to be held *prima facie* true; its orders and decisions *prima facie* reasonable; and the party appealing to have the burden of proof on all issues. Section 10—201(e)(iv) of the Act provides that a reviewing court shall reverse a Commission order, in whole or in part, where the Commission's findings are not supported by substantial evidence or the order violates State or Federal law. Although deference is to be accorded to the Commission's interpretation of its own rules and regulations, and its long-standing interpretation of the provisions of the Act, the Commission's interpretation of questions of law is not binding on a reviewing court. *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1989), 136 Ill. 2d 192, 204, 555 N.E.2d 693 (*BPI I*).

I

■ Edison initially asserts that by failing to appeal the Commission's earlier order in Docket No. 90—0038, which (1) established the rider as the best method to use to recover demand-side capability building costs; (2) required a provision for a prudence review; and (3) directed Edison to file such a rider, IIEC and CUB have waived any right to challenge the use of a rider to recover demand-side capability building costs or the provision for a prudence review. Accordingly, Edison urges that the challenges to the use of the rider and to the provision for prudence review be denied.

The Commission's order in Docket No. 90—0038, directing Edison to prepare such a rider, did not identify the same issues raised in this proceeding. Further, decisions of the Commission are not *res judicata*, as noted in *City of Chicago v. Illinois Commerce Comm'n* (1985), 133 Ill. App. 3d 435, 440, 478 N.E.2d 1369, quoting from *Mississippi River Fuel Corp. v. Illinois Commerce Comm'n* (1953), 1 Ill. 2d 509, 513, 116 N.E.2d 394:

" 'The concept of public regulation includes of necessity the philosophy that the [C]ommission shall have power to deal freely with each situation as it comes before it, regardless of how it may have dealt with a similar or the same situation in a previous proceeding.' "

Nor does section 10—201(f) of the Act support Edison, which provides:

"When no appeal is taken from a[n] \*\*\* order or decision of the Commission, as herein provided, *parties affected by such*

*** *order or decision,* shall be deemed to have waived the right to have the merits of the controversy reviewed by a court and there shall be no trial of the merits of any controversy in which such *** order or decision was made, by any court to which application may be made for the enforcement of the same, or in any other judicial proceedings." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 10—201(f).)

Therefore, only when a party who is affected by a decision fails to take an appeal from that decision is such party precluded from having the merits of that controversy reviewed in context of another judicial proceeding. Here, IIEC's and CUB's members were not affected by the order entered in Docket No. 90—0038 because that order did not set rates. The final order in Docket No. 90—0038 approved the theoretical concept of a rider, but not a specific rider with a rate impact.

Edison's reliance upon *City of Galesburg v. Illinois Commerce Comm'n* (1977), 47 Ill. App. 3d 499, 362 N.E.2d 78, is misplaced. The absence of *res judicata* in administrative proceedings makes it inappropriate and contrary to the promotion of judicial and administrative economy to maintain an appeal based only on a theoretical issue which may never "affect" an appellant. To the extent the *City of Galesburg* decision holds to the contrary, we decline to follow it.

We find no waiver of IIEC's or CUB's right to challenge the propriety of Rider 22.

## II

■ IIEC and CUB aver that because the Commission is mandated to set rates for public utility service which are just and reasonable, the Commission erred by approving Rider 22, which rider permits recovery for a single issue in violation of the prohibition against single-issue ratemaking.

In its instructive opinion in *Citizens Utilities Co. v. Illinois Commerce Comm'n* (1988), 124 Ill. 2d 195, 200-01, 529 N.E.2d 510 (*Citizens Utilities Co.*), our supreme court explained:

"In establishing the rates that a public utility is to charge its customers, the Commission bases the determination on the company's operating costs, rate base, and allowed rate of return. A public utility is entitled to recover in its rates certain operating costs. A public utility is also entitled to earn a return on its rate base, or the amount of its invested capital; the return is the product of the allowed rate of return and rate base. The sum of those amounts—operating costs and return on rate base—is known as the company's revenue requirement. The

components of the ratemaking determination may be expressed in 'the classic ratemaking formula R (revenue requirement) = C (operating costs) + Ir (invested capital or rate base times rate of return on capital).' (*City of Charlottesville, Virginia v. Federal Energy Regulatory Comm'n* (D.C. Cir. 1985), 774 F.2d 1205, 1217, citing T. Morgan, Economic Regulation of Business 219 (1976).) The same formula is used by the Commission in ratemaking determinations for Illinois. The revenue requirement represents the amount the company is permitted to recover from its customers in the rates it charges. Ratemaking is done in the context of a test year, which in this case was 1983."

In determining the amount of money a utility is authorized to collect from the consumers, the Commission is required to consider *all* aspects of the utility's operations during a year selected by the utility as a test year. The test year so selected is intended to be representative of both the utility's anticipated rate-base expenses and its expected revenues, including overall costs and rate of return in the same year. Here, instead of considering costs and earnings in the aggregate, where potential changes in one or more items of expense or revenue may be offset by increases or decreases in other such items, single-issue ratemaking considers those changes in isolation, ignoring the totality of circumstances. Addressing this issue, the supreme court in *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1991), 146 Ill. 2d 175, 244-45, 585 N.E.2d 1032 (*BPI II*), stated:

"The rule against single-issue ratemaking recognizes that the revenue formula is designed to determine the revenue requirement based on the *aggregate* costs and demand of the utility. Therefore, it would be improper to consider changes to components of the revenue requirement in isolation. Oftentimes a change in one item of the revenue formula is offset by a corresponding change in another component of the formula. For example, an increase in depreciation expense attributable to a new plant *may* be offset by a decrease in the cost of labor due to increased productivity, or by increased demand for electricity. (Demand for electricity affects the revenue requirement indirectly. The yearly revenue requirement is divided by the expected demand for electricity to arrive at a per kilowatt hour rate. If actual demand is more than the estimated demand used in the formula, the utility's revenues increase.) In such a case, the revenue requirement would be overstated if rates were in-

creased based solely on the higher depreciation expense without first considering changes to other elements of the revenue formula. Conversely the revenue requirement would be understated if rates were reduced based on the higher demand data without considering the effects of higher expenses." (Emphasis in original.)

In the present case, the Commission authorized Edison to charge customers for DSM program costs without considering whether other factors offset the need for additional charges. The order violates the prohibition against single-issue ratemaking. The order thereby isolates one operating expense for full recovery without considering whether changes in other expenses or increased sales and income obviate the need for increased charges to consumers, which may result impermissibly in ratepayers facing additional charges for direct and indirect additional revenues to cover Edison's expenses and pay a return to its investors.

The Commission contends that single-issue ratemaking usually occurs in a general rate case setting where one item of revenue or expense is altered without taking into account related changes in other revenue and expense items. The Commission found that Rider 22 does not fit this scenario. "The acceptance of a single-issue ratemaking argument would totally hamstring Edison and the Commission. Under such a scenario, the Commission could not approve individual rate tariffs outside a general rate proceeding." We disagree.

An examination of Rider 22 reveals support for the contrary contention, that expenses incurred in connection with least cost planning essentially are ordinary expenses imposed by statute. Among the anticipated costs listed in Rider 22 are the following:

"Capability building costs are all direct out of pocket costs and all documented incremental costs incurred by Commonwealth Edison Company in the implementation and evaluation of capability building pilot programs and in its other DSM capability building activities, including but not limited to:

(a) Payroll for specifically identified DSM planning, designing, analysis, implementation and evaluation positions;

(b) Costs incurred for training and education for personnel involved in DSM capability building activities, including materials, travel, seminar participation and DSM organization membership;

(c) Costs incurred for contractors and consultants;

(d) Out of pocket program costs, including costs incurred for advertising and promotion; rebate, subsidy and incentive pay-

ments; metering in excess of standard; software, computer hardware, and data acquisition; and demand side measures installed at customer premises;

(e) Costs incurred in conducting workshops and participating in the cooperative process ordered in Docket 90—0038;

(f) Indirect costs related to the above."

Riders are useful in alleviating the burden imposed upon a utility in meeting *unexpected, volatile* or *fluctuating* expenses. (See *City of Chicago v. Illinois Commerce Comm'n* (1958), 13 Ill. 2d 607, 150 N.E.2d 776.) Examination of the Rider 22 costs set forth above involves payroll for specifically identified planning and similar positions; personnel training, education and travel; contractors and consultants costs; out-of-pocket promotion and computer costs; and conducting workshops. Such costs reveal no greater potential for unexpected, volatile or fluctuating expenses which Edison cannot control, than costs incurred in estimating base ratemaking. In contrast, costs over which Edison does not have control, exemplified by fuel costs, may be reflected automatically in a different rider, the Electric Fuel Adjustment Clause, Rider 20. Here, any lack of certainty in predicting costs would be ameliorated by the aggregate costs and revenues method of balancing now followed in setting base rates. In the case of Rider 22, as the Commission itself acknowledges, "the amount of dollars to be recovered by Edison through a rider mechanism is not significant." Further, the costs are recoverable through the usual base rate mechanism; only a delay in the recovery process would ensue, according to the Commission.

A utility must file its least cost plan every two years. (Ill. Rev. Stat. 1989, ch. 111⅔, par. 8—402.) Edison decided not to include those ordinary costs in its request for a rate increase and, therefore, did not include them in base rates. Such an omission does not justify single-issue treatment of costs in a rider. The authorization of Rider 22 is contrary to the supreme court decision in *Citizens Utilities Co.* and *BPI II* and the October 2, 1991, Commission order must be reversed.

### III

■ IIEC and CUB assert that the Commission violated section 9—244 of the Act (Ill. Rev. Stat. 1989, ch. 111⅔, par. 9—244 (now 220 ILCS 5/9—244 (West 1992)) (section 9—244)) by approving Rider 22 as an incentive to perform a legally required act.

Section 9—244 requires the Commission to study incentive-based regulation. The Commission is without authority to implement directly

incentive-based regulation, but only may report its findings to the legislature. (*Illinois Bell Telephone Co. v. Illinois Commerce Comm'n* (1990), 203 Ill. App. 3d 424, 437-38, 561 N.E.2d 426 (*Illinois Bell Telephone*).) The Commission has set forth as justification for authorizing Rider 22 that it will remove a barrier to least cost planning. By approving Rider 22, the Commission has, in effect, provided Edison with an incentive to comply with both section 8—402 and the Commission's order in Docket No. 90—0038, which ordered Edison to propose a rider. Least-cost programs such as this are mandated by statute. Section 9—244 requires for any study of incentive regulation to "consider the consistency of such mechanism with the existing obligation of utilities to provide least-cost service and traditional ratemaking principles." (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 9—244.) Edison has an ongoing legal obligation to comply with the Commission's least cost plan. (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 8—402.) There was no reason to give Edison this illegal incentive and the October 2, 1991, Commission order must be reversed for this reason as well.

## IV

IIEC and CUB contend that the Commission has improperly authorized Edison to charge ratepayers for lost revenues because the lost revenue provision is illegal.

Lost revenues are revenues that the utility would have earned but for DSM capability building activities. The formula for recovery of lost revenues in Rider 22 fails to take into consideration Edison's aggregate costs and revenues, which is also the vice inherent in this revenue recapture as set forth succinctly in Commissioner Ruth Kretschmer's critical characterization of Edison's recovery of lost revenues, in part:

> "This Order [approving Rider 22] allows Commonwealth Edison Company, to recover *all* documented incremental costs associated with the research and development of demand-side management resource options. These costs include screening, implementation and evaluation of pilot programs as well as carrying costs and—incredibly, in my opinion—lost revenues. Thus, even if the pilot programs work and usage is decreased, ratepayers will be required to reimburse Commonwealth Edison (with interest) for the sales Commonwealth Edison claims it did not make due to the implementation of those programs and for any expenses incurred by Commonwealth Edison in not making those sales.
>
> Incredible but true!"

Charging ratepayers for lost revenues due to decreased demand vitiates the goal of reducing energy costs by reducing demand. Section 8—402(a) (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 8—402(a)) provides:

"The objective of this Section shall be to ensure the provision of adequate, efficient, reliable and environmentally safe energy services at the lowest possible cost to all Illinois energy consumers and users, and, in doing so, to utilize, to the fullest extent practicable, all economical means of conservation, nonconventional technologies relying on renewable energy resources, cogeneration and improvements in energy efficiency as the initial sources of new energy supply."

Requiring ratepayers to bear the expense of services they avoid due to conservation or DSM programs is not only incredible, but runs afoul of basic ratemaking principles. The Act requires that rates be set which "accurately reflect the long-term cost of such services and which are equitable to all citizens." (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 1—102 (now 220 ILCS 5/1—102 (West 1992)) (section 1—102).) Both in *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n* (1973), 55 Ill. 2d 461, 483, 303 N.E.2d 364, and in *Candlewick Lake Utilities Co. v. Illinois Commerce Comm'n* (1983), 122 Ill. App. 3d 219, 227, 460 N.E.2d 1190, the courts have asserted that ratepayers are not to pay certain costs unless they directly benefit from them. The lost revenue charge here does not reflect the cost of providing electric service, does not reflect a cost that benefits ratepayers and, further, adds to Edison's revenues without regard to whether Edison's demand or revenues increased because of factors unrelated to DSM programs. This is yet another basis for reversal.

## V

■ CUB contends that the Commission cannot authorize Edison to collect funds from ratepayers subject to later reconciliation, a violation of the prohibition against retroactive ratemaking.

The Commission approved a formula in Rider 22 for determining charges to Edison's customers. Part of that formula is a review procedure to determine whether Edison prudently incurred the expenses passed on to its customers. If the review results in a finding that the rates collected were too high, a refund possibly would be ordered. Ordering of refunds when rates are too high, and surcharges when rates are too low, violates the rule against retroactive ratemaking. (See *BPI I*, 136 Ill. 2d at 209; *Illinois Bell Telephone*, 203 Ill. App. 3d 424, 561 N.E.2d 426.) Rider 22 was improvidently approved for this reason as well.

## VI

IIEC asserts that Rider 22 violates the test year rule because the Commission cannot authorize an automatic increase in rates without applying that rule; there is no evidence in the record as to whether Rider 22 will result in an increase of 1% or more of Edison's total jurisdictional revenues; and the "needs" test is a corollary to the test year rule.

The Commission concluded that a test year is appropriate only in the context of a base rate increase and here only where an increase in total jurisdictional annual revenues of 1% or more is requested. IIEC maintains that the Commission's application of the rule is contrary to case law which requires that the Commission view the totality of the utility's financial circumstances. Further, the Commission allegedly has failed to make a finding as to what level total jurisdictional revenues will be affected and, in fact, the record is devoid of any substantial evidence with which to make this finding.

■ The supreme court has held that ratemaking is done in the context of a test year. (*Citizens Utilities Co.*, 124 Ill. 2d at 201.) The test year concept is one promulgated by the Commission in its own rules, particularly General Order 210 (83 Ill. Adm. Code §285.150 (1985)). General Order 210 requires a utility to file its rate data in accordance with a proposed one-year test year, which may be an historical, current or future year. This rule has the salutary purpose of preventing the utility from mismatching revenues and expenses. For example, the utility cannot use a low revenue figure from one year and a high expense figure from another year to justify a rate increase.

In *BPI II*, the supreme court addressed, among other issues, Commonwealth Edison's right to record and recover deferred charges related to three nuclear generating units, which were broken down into three different categories. The court then examined the categories of deferred charges in context of arguments raised in that case, including whether their recovery violated the Commission's test year rule and the prohibition against single-issue ratemaking, and held (*BPI II*, 146 Ill. 2d at 237-38):

> "a utility's rates are a function of its annual revenues and operating expenses, as well as its rate base. In order to accurately determine the utility's revenue requirement, the Commission established filing requirements under which a utility must present its rate data in accordance with a proposed one-year test year. The purpose of the test-year rule is to prevent a util-

ity from overstating its revenue requirement by mismatching low revenue data from one year with high expense data from a different year. *Business & Professional People I*, 136 Ill. 2d at 219."

Deferred depreciation and decommissioning expenses were then held subject to the test year rule because they were operating expenses. (*BPI II*, 146 Ill. 2d at 240-41.) These deferred operating expenses cannot be recovered, even in context of a rate case, because the test year rule would be violated. Here, "operating expenses" are categorically no different than DSM costs. DSM costs determined outside the context of a test year cannot be recovered from ratepayers. Rider 22, which does not utilize a test year, is illegal for this reason as well.

Edison would be authorized to recover DSM costs from a period other than the test year period upon which Edison's current revenue requirement is based. A mismatch between DSM expense and the revenue data from the test year, intended to be prevented under General Order 210, would be authorized under Rider 22. In direct contravention of the supreme court's reasoning, Edison's Rider 22 contemplates recovering demand-side capability building costs (operating costs) which have not been presented in the context of a test year, contrary to the Commission's practice of setting rates on a year to year basis, and in violation of its own rule.

The Commission recently determined Edison's revenue requirement in Docket No. 90—0169, based on test year data. The Commission concluded in its order that it was neither necessary nor desirable to require preparation of a test year data forecast in order to permit Edison to recover DSM expenses. The Commission, without any supporting evidence, assumes that each dollar of DSM expense incurred will automatically result in one dollar's worth of reduced revenue for Edison; however, since test year principles were not followed, the Commission cannot determine whether the increase in DSM expenditures will be offset by a decrease of other expenditures currently reflected in Edison's revenue requirement, or an increase in revenue not reflected in the test year underlying the utility's current base rates.

■ The Commission also asserted that a test year application is not required unless Edison's revenue request results in an increase of more than 1% of its total jurisdictional revenues. The level of DSM costs Edison expects to recover through Rider 22 is not shown by substantial record evidence; there is no foundation for the Commission to determine whether DSM costs will result in a 1% or more jurisdictional revenue increase. Absent any limit on the amount of costs

that can be recovered under Rider 22, the possibility exists of an overall revenue increase of more than 1%.

Clearly, the test year requirement applies to these facts and the Commission's conclusion to the contrary was error and must be reversed.

## VII

IIEC urges error in the Commission's rejection of its proposed cap on DSM cost recovery.

■ IIEC proposed a "cap" of $5 million on the amount of DSM costs Edison may recover under Rider 22, which the Commission rejected for the reason that other provisions in the rider would alleviate the need for a cap. The Commission held that the costs to be flowed through the rider would be (1) reviewed by its staff every month; (2) subject to periodic prudency reviews which may result in application of a reconciliation factor; and (3) subject to additional review during the biennial least cost planning dockets and the ongoing cooperative process. The cap was devised by IIEC because Edison continually maintained it did not know how much it intended to recover through the rider. IIEC argued that some protection was needed for the ratepayers and arrived at the $5 million dollar figure because Edison was able to identify only $800,000 in out-of-pocket costs for three pilot programs. IIEC further reasoned that if Edison's costs approached the cap, it could then petition the Commission for relief, demonstrating the bases for its request.

Commissioner Paul G. Foran's dissenting opinion, supporting IIEC's proposed $5 million cap, suggested that elimination of the cap would undermine the Commission's ability to monitor and review the costs passed through Rider 22, despite the three checks described above, because:

> "Such costs could be incurred completely independently of the manner in which the programs are managed and, therefore they would be outside the scope of the annual management prudence review. Such costs may also be of a nature that renders them undetectable until they become ponderous, in which case the monthly status reports, as well as the biennial review, will not be effective checks; this problem will be compounded by the time and resource constraints already faced by the Staff. Thus, the monthly filing and the biennial review may become too little review, too late."

Commissioner Foran was concerned that the majority had provided Edison with "essentially a blank check for these vague DSM capability expenses."

Edison claimed that the cap would result in the arbitrary disallowance of prudently incurred costs and would necessarily restrict the flexibility that is needed to promote successful DSM capability building; however, no foundation was established for Edison's claim that the cap would restrict its capability building efforts. Indeed, Edison did not demonstrate that its DSM capability building efforts to date have been hindered by the lack of an approved cost recovery mechanism, or by a mechanism that would impose a cap, although Edison had been engaged in DSM and conservation activities well before the rider was filed. It must be noted that regardless of whatever cost recovery mechanism is approved or whatever constraints the Commission may impose, the utility is obligated by law to pursue DSM programs. Ill. Rev. Stat. 1989, ch. 111²/₃, par. 8—402.

The Commission's order is not supported by substantial evidence in the record in this regard and must be reversed.

The reasons set forth above compel this court to reverse the Commerce Commission's order authorizing Commonwealth Edison to recover costs associated with demand-side management through Rider 22.

Reversed.

McCORMICK, P.J., and DiVITO, J., concur.