CENTRAL ILLINOIS LIGHT COMPANY, Petitioner-Appellant, v. ILLINOIS COMMERCE COMMISSION *et al.*, Respondents-Appellees (Roland W. Burris, Attorney General, *et al.*, Respondents).—CENTRAL ILLINOIS LIGHT COMPANY, Appellant, v. ILLINOIS COMMERCE COMMISSION, Appellee.—CENTRAL ILLINOIS PUBLIC SERVICE COMPANY, Appellant, v. ILLINOIS COMMERCE COMMISSION, Appellee.—NORTHERN ILLINOIS GAS COMPANY, Appellant, v. ILLINOIS COMMERCE COMMISSION, Appellee.—ILLINOIS POWER COMPANY, Appellant, v. ILLINOIS COMMERCE COMMISSION, Appellee.—IOWA-ILLINOIS GAS AND ELECTRIC COMPANY, Appellant, v. ILLINOIS COMMERCE COMMISSION, Appellee.—COMMONWEALTH EDISON COMPANY, Appellant, v. ILLINOIS COMMERCE COMMISSION, Appellee.

Third District   Nos. 3—92—0864, 3—92—0879, 3—92—0887, 3—92—0888, 3—92—0955, 3—92—0957, 3—92—0967, 3—93—0200, 3—93—0201, 3—93—0238, 3—92—0787 cons.

Opinion filed December 29, 1993.

BARRY, J., dissenting.

Edward J. Griffin and W. Michael Seidel, both of DeFrees & Fiske, of Chicago, for petitioner.

Eve M. Blackwell, of Office of Public Counsel, of Springfield, for respondent Office of Public Counsel.

Owen E. MacBride and Carrie J. Hightman, both of Schiff, Hardin & Waite, of Chicago, and Gary Pasek, of Illinois Power Company, of Decatur, for respondent Illinois Power Company.

Cathy Woollums, Richard G. Lovig, and Brent E. Gale, all of Iowa-Illinois Gas & Electric Company, of Davenport, Iowa, for respondent Iowa-Illinois Gas & Electric Company.

David Linton, of Union Electric Company, of St. Louis, Missouri, for respondent Union Electric Company.

Roland W. Burris, Attorney General, of Springfield (James E. Weging, Special Assistant Attorney General, of Chicago, of counsel), for respondent Illinois Commerce Commission.

Stephen J. Mattson, Barbara E. Cohen, and Michele Odorizzi, all of Mayer, Brown & Platt, of Chicago, for respondent Northern Illinois Gas Company.

Boyd J. Springer, Christopher W. Flynn, and David J. Rosso, all of Jones, Day, Reavis & Pogue, of Chicago, for respondent Central Illinois Public Service Company.

Gerard T. Fox and James Hinchliff, both of Peoples Gas Light & Coke Company, of Chicago, for respondent Peoples Gas Light & Coke Company.

Eugene Bernstein and Jeffrey E. Leeb, both of Sidley & Austin, of Chicago, for respondent Commonwealth Edison Company.

Eric Bramlet, of Koger & Bramlet, P.C., of Mt. Carmel, for respondent Mt. Carmel Public Utility Company.

Karen Lusson, of Citizens Utility Board, of LaGrange, for respondent Citizens Utility Board.

JUSTICE STOUDER delivered the opinion of the court:

On September 30, 1992, the Illinois Commerce Commission (the Commission) issued an order in a proceeding entitled "Investigation concerning issues related to coal tar clean-up expenditures ***" (the generic order). The proceedings had been initiated on the Commission's own motion to determine on an industry-wide or "generic" basis the proper ratemaking treatment for costs associated with cleaning up environmental damage resulting from former manufactured gas operations (referred to as remediation costs). The cleanup of these sites is required by Federal and State environmental laws.

Following the denial of petitions for rehearing, the following utility-appellants (hereinafter the utilities) filed petitions for review in various appellate districts: Central Illinois Light Company, Northern Illinois Gas Company, The Peoples Gas Light & Coke Company, North Shore Gas Company, Iowa-Illinois Gas & Electric Company, Commonwealth Edison Company, Central Illinois Public Service Company, Illinois Power Company, Mt. Carmel Public Utility Company, and Union

Electric Company. In addition, appellants, the Office of Public Counsel and the Citizens Utility Board (hereinafter OPC/CUB), filed petitions for review. Subsequently, OPC/CUB sought a supervisory order from the Illinois Supreme Court seeking to have all appeals consolidated in the fourth district. The court denied this motion. However, on its own motion, the court ordered all appeals transferred to this district. On review, we now affirm the Commission's order.

The record shows that manufactured gas plants (MGPs) were operated in Illinois from the mid-1800's to the 1950's. These plant operations extracted gas from coal and coke for distribution to customers. Because of limitations in the distribution system, these plants could only serve a relatively small area. Therefore, there were quite a number of these plants. The record indicates well over 100 MGPs operated in Illinois.

The process utilized to extract the gas varied. Depending on the process used, various by-products and residuals were created, including coal tar, ammoniacal liquor, clinker, naphthalene, light oils and cyanide. Some of these products were marketable and thus were recovered during the process, stored and later sold. Coal tar in particular was used in roofing, road construction and even shampoo. The sale of these by-products and residuals was encouraged because they helped to reduce the cost of supplying service to utility customers. These substances were often stored on site in underground tanks. Those products which for one reason or another were unmarketable were treated as wastes and were disposed of both on and off site.

With the advent of interstate natural gas pipelines in the 1950's, the manufactured gas process became obsolete. The MGPs were phased out and decommissioned in the 1940's and 1950's. According to testimony in the record, the general practice was to level unneeded aboveground structures and fill in below-grade structures with demolition debris and other fill. Underground pipes and tanks were often left in place. Some of these underground structures were drained of at least their liquid contents.

Beginning in the 1960's and early 1970's, following growing public awareness, the Federal government increasingly enacted legislation addressing environmental pollution. (See, e.g., Solid Waste Disposal Act (1965) (42 U.S.C. §6901 (1988), as amended); Clean Air Act (1970) (42 U.S.C. §7401 et seq. (1988), as amended); Federal Water Pollution Control Act (1972) (33 U.S.C. §1251 et seq. (1988), as amended).) The Environmental Protection Agency (EPA) was established in 1970. At about the same time, the Illinois Environmental Protection Agency was established. It was not until the passage of the Resource Conser-

vation and Recovery Act (42 U.S.C. §6901 *et seq.* (1988)) in 1976, and more importantly, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) (42 U.S.C. §9601 *et seq.* (1988)) in 1980, that the regulation and cleanup of industrial and hazardous wastes was comprehensively addressed by the Federal government.

CERCLA (also known as Superfund) requires responsible parties to clean up contaminated sites. Under CERCLA, liability for the cleanup extends to current and past owners or operators of a site from which there has been a release or there is a substantial threat of a release of a hazardous substance, as well as those parties who generate wastes that come to be present at the site. The State of Illinois has enacted legislation along similar lines. See Ill. Rev. Stat. 1991, ch. 111½, par. 1022.2 *et seq.*

In the 1980's, utilities in Illinois began to address the problem of cleaning up former MGP sites. The record shows that working in cooperation with the Illinois Environmental Protection Agency, the utilities have attempted to voluntarily clean up these sites. By doing the cleanup on a voluntary basis and avoiding government involvement, the utilities stand to save a substantial amount of money. The record also reveals that the cleanup process has only just begun in recent years and that the cleanup will continue for a number of years in the future. Thereafter, depending on the cleanup method utilized, some sites will require monitoring for decades.

The record shows that the scope of the problem faced by each individual utility varies. Some utilities will be responsible for cleaning up only one site, while others may have in excess of 10 sites for which they are a responsible party. The type and total cost of remediation required will also vary between the utilities.

In the early 1990's, some utilities sought recovery of these costs through the ratemaking process. (See CILCO—Order on Rehearing, docket No. 90—0127 (August 2, 1991); North Shore Gas Company—Order, docket No. 91—0010 (November 8, 1991).) In February 1991, the Commission's staff recommended the Commission initiate proceedings to examine coal tar cleanup issues common to the entire utility industry. It was envisioned at the time that after addressing the common issues involved in the cleanup, utility-specific facts and issues would then be considered in separate proceedings.

On March 6, 1991, the Commission entered an order initiating the instant "generic" proceedings. Hearings were held in the spring and summer of 1991. However, it should be noted that while this generic proceeding was underway, coal tar remediation issues were also being considered in the utility-specific rate cases cited above. Due to the

limitation on the Commission's power to suspend proposed rates (see Ill. Rev. Stat. 1991, ch. 111²/₃, par. 9—201(b)), the Commission reached certain findings related to coal tar issues and the recovery of remediation costs prior to these issues being addressed in the generic proceeding. See CILCO—Order on Rehearing, docket No. 90—0127 (August 2, 1991); North Shore Gas Company—Order, docket No. 91—0010 (November 8, 1991) (referred to hereinafter as the CILCO and North Shore rate cases, respectively).

Germane to the issues presented in the instant case, the Commission, in the CILCO and North Shore rate cases, found, with three of the seven commissioners dissenting, that the remediation costs associated with coal tar cleanup were fully recoverable from ratepayers. The CILCO rate case was appealed to this court. Meanwhile, the membership on the Commission changed. Two new members joined the Commission in April 1992. On September 30, 1992, while the CILCO rate case was pending before this court, the Commission entered its order in the instant generic proceedings. Unlike CILCO and North Shore, the Commission, again by a four to three decision, concluded in the generic proceedings that the remediation costs should be shared between ratepayers and shareholders of the utilities.

On appeal, OPC/CUB contend the Commission erred in finding the utilities' actions were prudent and reasonable in operating and decommissioning the MGPs. OPC/CUB assert the utilities failed to carry their burden of establishing that they acted prudently and reasonably because they failed to present company-specific evidence. Therefore, OPC/CUB argue the Commission's decision on this issue is not supported by substantial evidence and is arbitrary and capricious. OPC/CUB further contend evidence shows the dangers of coal tar were known at the time, and this refutes the finding that the utilities acted reasonably and prudently in operating and decommissioning the MGPs. The utilities counter that OPC/CUB waived this argument by failing to raise the issue in their applications for rehearing filed with the Commission following the issuance of the generic order. Whether or not the issue is waived, we find no support for OPC/CUB's contentions.

In the generic order, the Commission found the utilities had made a *prima facie* showing that their operating and decommissioning practices had been consistent with the industry practices of the time. The Commission further found that the nature and scope of the environmental dangers were not known and could not have been known at the time the MGPs were operated and then decommissioned. The Commission stated the evidence showed the industry's practices had

been reasonable and prudent in light of the technological, scientific and medical knowledge available at the time. The Commission concluded that in future company-specific cases a presumption would exist that the operation and decommissioning of Illinois MGPs was in conformity with industry practices of the time, and that the companies acted reasonably and prudently.

■ The issue presented is one of fact. The Commission's findings of fact are to be accepted as *prima facie* true and cannot be set aside on appeal unless they are against the manifest weight of the evidence. (*Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1991), 146 Ill. 2d 175, 585 N.E.2d 1032.) By statute, our review of the Commission's order is limited to determining whether the Commission: (1) acted within the scope of its statutory authority; (2) set out findings of fact adequate to support its decisions; (3) issued findings which were supported by the manifest weight of the evidence; and (4) rendered decisions which do not infringe upon a constitutional right. See Ill. Rev. Stat. 1991, ch. 111⅔, par. 10—201(e)(iv).

■ In this case, the Commission was confronted with the question of the prudency of operations which ceased 40 years ago. The record of those operations was logically less than complete. However, the record in this case shows that utility witnesses Dr. Andrew Middleton and Mr. James Frank each studied available information on the operation and decommissioning of a sampling of 8 to 12 MGP sites. They testified that the disposal practices used during the MGPs' operations and at the time they were dismantled were consistent with the knowledge and practices of the time. They testified that the practices that have now led to present-day contamination or potential contamination were considered acceptable at the time and were standard practice. Middleton and Frank found no evidence in the materials that they reviewed that operators of MGPs had any reason to believe that their operations and practices were not safe. The Commission found this evidence was unrefuted.

We find the evidence more than sufficient to support the Commission's finding that in general the MGPs were prudently and reasonably operated and decommissioned. Those operations cannot be judged by today's knowledge of environmental hazards. Viewed in the proper historical context, the evidence supports a presumption that as an industry, MGPs were operated and decommissioned, and wastes disposed of, in a prudent and reasonable manner. The witnesses had a limited amount of information on hand. It was not necessary that the operation of each MGP plant be reviewed in order to reach a general

finding on the standard practices utilized in operating and decommissioning these plants. The Commission has only determined that in future company-specific cases, a rebuttable presumption will be extended to the utility that its operations were reasonable and prudent. The record supports this conclusion.

We find unavailing OPC/CUB's argument that the Commission's conclusion is refuted by the evidence of nuisance cases brought against utilities in the late 19th and early 20th centuries. (See, *e.g., Ottawa Gas Light & Coke Co. v. Graham* (1864), 35 Ill. 346; *Belvidere Gaslight & Fuel Co. v. Jackson* (1898), 81 Ill. App. 424.) These cases involved noxious smells and contaminated water. However, these *personal* damage actions, while revealing that pollution problems did exist, do not show a knowledge of the scope and nature of environmental hazards even close to that which has developed in the last 20 or 30 years. Most environmental legislation is less the 25 years old. The EPA was not established until 1970, nearly two decades after most MGPs ceased operations. It was another decade before CERCLA was enacted: enforcement of which did not commence until sometime afterward. In sum, it was for the Commission to determine the facts based on the record presented. We cannot say its findings on this issue are against the manifest weight of the evidence.

OPC/CUB also argue the Commission erred in permitting recovery of remediation costs through a rider mechanism. A rider is a form of tariff which modifies an otherwise applicable standard rate under specific circumstances. OPC/CUB contend the Commission is without statutory authority under the Public Utilities Act (the Act) (Ill. Rev. Stat. 1991, ch. 111²/₃, par. 1—101 *et seq.*) to approve such a rider. OPC/CUB also allege the approval of a rider violates the prohibition against retroactive ratemaking and single-issue ratemaking, and violates the Commission's test year rules. OPC/CUB assert that if these costs are recoverable at all from the ratepayers, they are only recoverable in the context of a traditional rate case. The utilities again maintain that many of the arguments raised by OPC/CUB on this issue were waived by the failure to raise them in the petitions for rehearing.

In the generic order, the Commission stated that the "preferred" method for the recovery of remediation costs was through a rider mechanism with a prudency review feature rather than base rates. The Commission noted that given the wide divergence in the situation of each utility, *vis-a-vis* the amount and type of cleanup involved, and the difficulty in forecasting the scope, timing and costs of investigation and remediation, the Commission believed that in general a rider

would prove to be the more accurate and efficient means of recovering these costs. However, again noting the wide variation in circumstances between the companies, the Commission concluded that a rider was not the exclusive method of recovery and that individual utilities were not precluded from proposing other methods in light of their particular circumstances.

The Commission further concluded that a prudency review was an essential feature to ensure that a utility's cleanup activities and costs were necessary and cost-effective. Thus, the remediation costs subject to recovery are to be limited to prudently incurred costs paid to outside parties. The Commission also concluded that the implementation of a coal tar rider need not be proposed in the context of a traditional rate case.

In response to OPC/CUB's contentions, the Commission asserts the Illinois Supreme Court has held that the Commission has the statutory authority to approve cost recovery through a rider mechanism in the appropriate situation. In *City of Chicago v. Illinois Commerce Comm'n* (1958), 13 Ill. 2d 607, 150 N.E.2d 776, the supreme court held that the Commission had the power, in the proper case, to authorize an automatic cost-of-natural-gas adjustment clause. The court noted the automatic adjustment clause was a set formula by which the price of gas to the consumer was fixed by inserting in the formula the wholesale price of natural gas as established by the Federal Power Commission (FPC). The court held that the Commission's statutory authority to approve rate schedules embraced more than the authority to approve rates in terms of dollars and cents, and that the legislature had vested in the Commission the ratemaking function which included the making of "pragmatic adjustments."

The court went on to consider whether the Commission had abused its discretion in approving the automatic adjustment clause. In finding no abuse of discretion, the court noted the reasonableness of the wholesale rates was determined by the FPC. The record showed these costs amounted to approximately 46% of the utility's operating expenses.

OPC/CUB maintain such riders have been found to violate the prohibition against single-issue and retroactive ratemaking, and to violate the Commission's "test year" rules, citing *A. Finkl & Sons Co. v. Illinois Commerce Comm'n* (1993), 250 Ill. App. 3d 317, 620 N.E.2d 1141. However, we do not read the *Finkl* opinion in the broad terms asserted by OPC/CUB.

In *Finkl*, the first district reversed an order of the Commission which had allowed Commonwealth Edison to utilize a rider to recover

costs associated with demand-side management programs. Although the court found the rider in that case to violate both the prohibition against single-issue and retroactive ratemaking, and to contravene the Commission's "test year" requirements, we do not interpret the opinion as holding that all riders are prohibited. We note the opinion states with apparent approval that riders are useful in alleviating the burden imposed on utilities in meeting unexpected, volatile or fluctuating expenses. However, in the case before the court, the first district found the demand-side management expenses were not of such a nature as to require rider treatment and could be readily addressed through traditional base rate proceedings.

Therefore, we read *Finkl* as holding that the Commission abused its discretion in allowing a rider recovery mechanism under the circumstances because demand-side management costs are not of an unexpected, volatile or fluctuating nature so as to necessitate recovery through a rider. Again, we do not read *Finkl* as holding that the Commission does not have the authority to allow recovery of costs through riders. Given our view of the *Finkl* court's holding, we view the opinion's discussion of retroactive ratemaking and test year rules as *dicta*.

■ In the instant case, we find no abuse of discretion on the part of the Commission in concluding that coal tar remediation costs can be recovered through a rider mechanism. The record shows these costs will vary widely from year to year depending on the type of remediation activities: from relatively small sums in the thousands (investigation costs) to the millions of dollars (actual cleanup costs). We view these costs as the type of unexpected, volatile and fluctuating costs which are more efficiently addressed through a rider mechanism. Therefore, we find the Commission had the authority to authorize a rider as the preferred method of recovery, and that under the circumstances such authorization did not constitute an abuse of discretion.

Finally, we turn to the most difficult of the issues raised on this appeal, and one to which we alluded above: the Commission's decision that remediation costs should be "shared" between ratepayers and utility shareholders. Previously, in the CILCO and North Shore rate cases, the Commission majority concluded that such costs were current and legitimate expenses which were reasonably incurred and thus should be recovered from ratepayers. By the time the instant case came up for decision, the membership on the Commission had changed. The majority of Commissioners now concluded that such

costs should not be fully borne by either the ratepayers or the shareholders, but shared.

In analyzing the nature of this cost, the Commission majority discussed at length the fact that this cost was connected to the cleanup of contaminated land. The Commission noted that unlike shareholders, ratepayers have no legal interest in utility property. Ratepayers pay only for the services derived from the use of that property. Shareholders on the other hand enjoy the benefits of utility property ownership, while also bearing the risks associated with such ownership. Thus, the majority found that since shareholders enjoy the profits from the sale of utility land holdings, they should be required to bear the risks associated with that land. The Commission concluded that consistent with the Commission's treatment of land sales, remediation costs should be borne by shareholders because they stand to receive the benefit when the land is sold.

(One difficulty with this analysis is that a utility would not necessarily have to be the present owner of contaminated land to be found liable for cleaning it up. Under CERCLA, a utility could be responsible for the cleanup of property it no longer owns, and in some cases, property it never owned. Liability under CERCLA is not premised solely on current ownership of contaminated land; it is premised on who is responsible for the hazardous waste being present at the site.)

Second, the Commission majority analyzed the connection between remediation costs and the provision of current services to ratepayers. The majority stated that under the Act, utilities can only recover those costs which are necessary for the provision of current service. The majority found remediation costs "have no link to the provision of current utility service to ratepayers." While noting that these costs result from current Federal and State environmental laws, the majority was unpersuaded that this fact alone should compel their treatment as recoverable operating expenses.

The majority agreed that *Peoples Gas Light & Coke Co. v. Slattery* (1939), 373 Ill. 31, 25 N.E.2d 482, stood for the proposition that prudently incurred operating expenses are fully recoverable in rates. However, because remediation costs "lacked even the most tenuous link to the provision of current service," the majority was not persuaded that these costs should be fully recovered from ratepayers.

Citing section 1—102 of the Act (Ill. Rev. Stat. 1991, ch. 111²/₃, par. 1—102), the majority stated that the Commission was charged with fashioning "equitable regulatory policies." Since the majority could find no legal requirement that ratepayers be held responsible for "all" coal tar cleanup costs, the majority found there was "ample

equitable justification" for a sharing of costs between ratepayers and shareholders. The majority analogized the situation to the treatment of a cancelled plant which was never utilized to provide service to ratepayers. A sharing of remediation costs was to be achieved by use of a rider and spreading the cost recovery over a five-year period with no carrying costs on the unrecovered balance. Thus, while the utilities would recover the total cost incurred in any particular year over the five-year period, under the rider they would not recover their interest charges on the unrecovered portions.

On appeal, the utilities argue remediation costs are current and legitimate operating expenses which by law are fully recoverable from ratepayers. OPC/CUB assert remediation costs are unrelated to the provision of current service to customers and therefore unrecoverable from ratepayers, *i.e.*, they are not an operating expense. On appeal, the Commission takes a third position, contending that while remediation costs may be a "cost of doing business," they are not necessarily an operating expense and therefore may be treated differently from ordinary operating expenses. The Commission denies in its brief that remediation costs are being "shared." Whittled to its core, this issue involves the question of how to characterize these costs, and thus how to treat them for regulatory purposes. In order to appreciate the difficult theoretical aspect of this issue, we set out some of the main contentions of the parties below.

Again, as in the case of the use of a rider mechanism, we are confronted with the issue of (1) whether the Commission has the authority to authorize the sharing of costs between ratepayers and shareholders, and (2) whether the Commission abused its discretion in ordering a sharing of remediation costs. The parties contend the issue presented is one of law. Our review is limited to determining whether the Commission: (1) acted within the scope of its statutory authority; (2) set out findings of fact adequate to support its decisions; (3) issued findings which were supported by the manifest weight of the evidence; and (4) rendered decisions which do not infringe upon a constitutional right. (Ill. Rev. Stat. 1991, ch. 111²/₃, par. 10—201(e)(iv).) We also note the Commission's findings of fact are to be accepted as *prima facie* true and cannot be set aside unless they are against the manifest weight of the evidence. *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1991), 146 Ill. 2d 175, 585 N.E.2d 1032.

On appeal, the utilities contend that under the regulatory bargain between themselves and their customers, they are required to keep the cost of service to the minimum required for a reasonable rate of

return on shareholder investment. As part of that bargain, the utilities argue, citing the prefatory language found in section 1—102(a)(iv) of the Act, that they are allowed to recover from ratepayers the reasonable cost of providing that service. (See Ill. Rev. Stat. 1991, ch. 111⅔, par. 1—102(a)(iv).) Therefore, the utilities argue they are entitled to full recovery of prudently incurred remediation costs as a matter of law. The utilities cite the fact that in the CILCO and North Shore rate cases the Commission determined these costs to be current and legitimate operating expenses fully recoverable from ratepayers.

The utilities argue this case is analogous to the treatment of taxes as an operating expense, citing *Peoples Gas Light & Coke Co. v. Slattery* (1939), 373 Ill. 31, 25 N.E.2d 482. In *Slattery*, Peoples Gas brought an equitable action for an injunction against the Commission, which had denied a proposed rate increase, arguing that the existing rate was confiscatory. In reviewing the earnings of the utility to determine whether the rate of return established by the Commission's orders was too low, the Illinois Supreme Court addressed the Commission's treatment of certain tax expenses. Because of a dispute over the valuation of the utility's property, there was an ongoing controversy over the total amount of taxes due. At the time, when a taxpayer challenged a tax, the taxpayer was required to pay 75% of the amount billed prior to litigating the dispute. The utility had done this in 1935. The Commission assumed the utility would follow the same practice in 1936. Thus, the Commission reduced the utility's allowed operating expenses by an amount the Commission determined the utility would withhold. The court held this was error and that the utility should have been allowed, as an estimated operating expense, the entire amount of taxes billed. The court reasoned that the utility might choose not to litigate and simply pay the amount billed. The Commission's action was based on an assumption that the amount would be challenged, not on an actual withholding of 25% of the amount billed.

In the course of its rather brief discussion of the issue, the *Slattery* court made passing reference to the fact that taxes are imposed under the authority of a public law. The utilities latch on to this fact, contending *Slattery* stands for the proposition that costs imposed as a result of governmental regulation are operating expenses fully recoverable from ratepayers. The utilities assert remediation costs are no different than any other cost incurred as a result of compliance with governmentally imposed rules and regulations, *e.g.*, taxes, air pollution laws, labor laws, and occupational safety laws; the cost of which are treated as operating expenses and recovered from ratepayers.

We note the *Slattery* court also found the Commission erred in reducing the amount of recoverable operating expenses related to the maintenance of gas mains. The court held that absent a showing that the cost was unreasonable, the Commission was without authority to arbitrarily reduce this type of *bona fide* expense.

OPC/CUB note that the Commission found remediation costs have no nexus to current service and provide no direct benefit to ratepayers. Relying on *Candlewick Lake Utilities Co. v. Illinois Commerce Comm'n* (1983), 122 Ill. App. 3d 219, 460 N.E.2d 1190, and *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n* (1973), 55 Ill. 2d 461, 303 N.E.2d 364, OPC/CUB maintain that absent a connection to current service and a direct benefit to ratepayers, these costs are not recoverable from ratepayers. Therefore, OPC/CUB argue the Commission erred in allowing the utilities to recover part of these costs from ratepayers.

In *Illinois Bell*, the Illinois Supreme Court reviewed, *inter alia*, the propriety of the Commission's allowing recovery of certain costs as operating expenses. Regarding advertising costs, the court found the record sufficient to support the Commission's conclusion that such expenditures had not been excessive and were not improper. (The General Assembly has subsequently enacted statutory guidance on the treatment of advertising expenditures. (See Ill. Rev. Stat. 1991, ch. 111⅔, par. 9—225.) The court, however, found lobbying expenses incurred by three employees who spent part of their time discussing proposed legislation with lawmakers should not have been included as an operating expense. The court reasoned that ratepayers should not bear these costs since they had no voice in deciding which legislative proposals should be supported or opposed. (Such treatment is now mandated by section 9—224 of the Act (Ill. Rev. Stat. 1991, ch. 111⅔, par. 9—224).)

The court next considered the treatment of dues to civic, social and athletic clubs as operating expenses. Noting a split in authority, the court concluded that such expenditures should not be considered operating expenses for purposes of ratemaking. (See, however, subsequent legislative sanction for treating certain donations as operating expenses (Ill. Rev. Stat. 1991, ch. 111⅔, par. 9—227).)

The court also considered the allowance of a licensing fee paid to AT&T by Illinois Bell. The court held it was error to treat as an operating expense any portion of the licensing fee which was used for expenditures which would not be permissible if made by Illinois Bell, *e.g.*, charitable contributions and athletic club dues. The court further noted that some costs incurred and recovered in the licensing fee de-

rived from AT&T's status as a holding company and related to its position as an investor in Illinois Bell. The court held ratepayers should not be required to pay these costs unless they were shown to directly benefit ratepayers or the services rendered by Illinois Bell.

The court went on to find that bulk purchases of gasoline were properly treated as an operating expense.

In *Candlewick*, the second district considered the Commission's treatment of certain legal expenses. While noting that rate case expenses are properly allowed as operating expenses, the court found other legal expenses incurred by the utility were "extraordinary expenses." These expenses arose out of proceedings related to (1) customer complaints about the reasonableness of rates, (2) a Commission motion to reconsider its original rate order and (3) a chapter 11 bankruptcy. The court found it had been cited no authority supporting the allowance of such expenses. Citing *Illinois Bell*, the court stated: "Moreover, we agree with the Commission that these nonrecurring expenses were not shown to be to the benefit of the ratepayers and that there was insufficient proof to show the reasonableness of the charges. The utility has the burden of proving that any operating expense for which it seeks reimbursement directly benefits the ratepayers or the services which the utility renders." *Candlewick Lake Utilities Co. v. Illinois Commerce Comm'n* (1983), 122 Ill. App. 3d 219, 227, 460 N.E.2d 1190, 1196.

OPC/CUB contend remediation costs arise from past service and are not "caused" by current ratepayers; therefore, they are not recoverable from ratepayers. The utilities argue the costs denied in *Illinois Bell* and *Candlewick* were to one extent or another discretionary in nature, while the remediation costs in this case are mandated by law.

The Commission argues, and we agree in principle, that it is not bound by its decision in the CILCO and North Shore rate cases. (See *Mississippi River Fuel Corp. v. Illinois Commerce Comm'n* (1953), 1 Ill. 2d 509, 116 N.E.2d 394.) On appeal, the Commission contends that under the generic order remediation costs are not being shared, because the only "cost" being absorbed by the shareholders is the loss of the time-value of money on the unamortized portion of the remediation expenses, *i.e.*, carrying charges. The Commission asserts recovery of remediation costs are not being denied, only the carrying charges resulting from the Commission's treatment of these costs is not being recovered from ratepayers. The Commission maintains in its brief that it was concerned with charging ratepayers for costs which do not benefit them as utility users, but only as members of the

general public. Therefore, the Commission struck a "policy compromise."

The Commission argues the utilities wrongly ascribe to *Slattery* the proposition that all costs of doing business are operating expenses and therefore fully recoverable from ratepayers. The Commission contends there is a difference between an operating expense and a cost of doing business. The Commission concedes that the analogy between taxes and remediation costs is apt because both are a cost unrelated to public utility service. However, the Commission argues taxes have always been treated as an operating expense, while remediation costs are "novel" and will at some point end.

The Commission argues it appropriately took into account whether utility customers were benefited by the remediation activities of the utilities. The Commission states that public utilities are not in the business of cleaning up coal tar pollution. In sum, the Commission argues that given the rather unique character of these costs, the Commission must utilize its policy-making function to both protect the ratepayers and the financial integrity of the utilities.

In *Central Illinois Public Service Co. v. Illinois Commerce Comm'n* (1993), 243 Ill. App. 3d 421, 610 N.E.2d 1356 (CIPS), the fourth district affirmed a similar "sharing" mechanism in the context of rate case expenses. In *CIPS*, the Commission excluded from rate base the unamortized portion of rate case expenses. As proposed by CIPS, rate case expenses were to be amortized over a five-year period. As a result of amortization, CIPS claimed it incurred carrying costs associated with funds invested in the unamortized balance of the expenses. The Commission's order effectively denied recovery of these carrying costs. In *CIPS*, the Commission, citing *Candlewick*, contended that the unamortized balance of rate case expenses was not an asset which directly contributed to the generation of electricity or the supply of gas, and, therefore, it was reasonable that ratepayers not be required to pay a return on this balance.

The *CIPS* court affirmed the Commission's decision on this issue, noting that rate case expenses benefited both ratepayers and shareholders, and was not directly related to the provision of electricity and gas. The court also cited the Commission's finding that it was reasonable for shareholders as well as ratepayers to contribute to this expense. The court found CIPS would recover the entire amount of the principle invested in the rate case. The court concluded that based on the record it could not say the Commission's decision was improper.

■ We find the reasoning in *CIPS* persuasive, reasonable and applicable to the present case. Remediation costs are incurred as a result of current environmental laws and regulations. They are current costs. The fact that the materials were placed at a particular site 50 or 100 years ago is irrelevant to the fact that these sites have to be cleaned up *today*. On the other hand, the Commission found that remediation costs "have no link to the provision of current utility service to ratepayers." Assuming that no cost can be recovered from ratepayers unless it "directly" benefits utility customers and is "related" to current service, then these costs are not operating expenses for ratemaking purposes. However, like the rate case expenses, these costs in one sense can be viewed as benefiting both shareholders and ratepayers. Therefore, we find it was within the Commission's authority and discretion to work a sharing of these costs.

We recognize the difficult task the Commission faced in categorizing these costs given their rather unusual nature. As the Illinois Supreme Court said in the context of the automatic adjustment clause, "The legislature has vested in the Commission the rate-making function which 'involves the making of "pragmatic adjustments." ' (*Federal Power Com. v. Hope Natural Gas Co.*, 320 U.S. 591, 602, 88 L. Ed. 333, 344; *Federal Power Com. v. Natural Gas Pipeline Co.*, 315 U.S. 575, 586, 86 L. Ed. 1037, 1050.)" (*City of Chicago v. Illinois Commerce Comm'n* (1958), 13 Ill. 2d 607, 618-19, 150 N.E.2d 776, 782.) Thus, the Commission is entitled to considerable leeway. The CILCO and North Shore rate cases illustrate that reasonable minds can differ on this issue. The ultimate resolution of this issue would perhaps best be settled by legislative action. In any event, we cannot say the Commission erred in the instant case.

For the foregoing reasons, we affirm the Commission's "generic" order of September 30, 1992.

Affirmed.

SLATER, J., concurs.

JUSTICE BARRY, dissenting:
I respectfully dissent from my colleagues' resolution of the coal tar issues. As I earlier stated in my dissent in *Central Illinois Light Co. v. Illinois Commerce Comm'n* (1993), 252 Ill. App. 3d 577 (*CILCO I*), I believe that the Commission lacks authority to pass on to the utility's ratepayers charges for remediating past practices that bear no relation to providing services to current customers. As I see it, the

remediation expenses here at issue are even less appropriate charges to the ratepayers than the legal expenses incurred by the utility in *Candlewick Lake Utilities Co. v. Illinois Commerce Comm'n* (1983), 122 Ill. App. 3d 219, 460 N.E.2d 1190, or the lobbying expenses which the utility sought to recover from ratepayers in *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n* (1973), 55 Ill. 2d 461, 303 N.E.2d 364. I am not swayed by the fact that the expenses here involved may be substantial, far more so than those which were at issue in *Candlewick Lake* and *Illinois Bell*. In fact, I am particularly disturbed by the fact that the cost of cleaning up the sites remains unknown. The majority's approval of the utilities' recovery of an uncalculable cost from ratepayers, whether "shared" or not with the utilities' shareholders, as a "policy compromise" or "pragmatic adjustment," violates the legislative mandate.

The Commission majority in this case expressly noted that there was no legal justification for holding ratepayers responsible for coal tar cleanup costs. Nonetheless, the Commission chose to relieve the utility's investors from bearing the full burden of remediation costs and to "share" part of the costs with ratepayers based on its purported authority to fashion "equitable regulatory policies," pursuant to section 1–102 of the Public Utilities Act. My review of section 1–102, however, discloses no such broad policy-making authority. The legislature specifically declared that "the health, welfare and prosperity of all Illinois citizens require the provision of environmentally safe and least-cost public utility services at prices which accurately reflect the long-term cost of such services and which are equitable to all citizens." (Ill. Rev. Stat. 1991, ch. 111⅔, par. 1–102.) To that end, the legislature granted authority to the Commission to regulate utilities to ensure efficiency, environmental quality, reliability and equity in the provision of services and the rates charged. The legislature explicitly stated, however, that "the cost of supplying public utility services is [to be] allocated to those who cause the costs to be incurred." (Ill. Rev. Stat. 1991, ch. 111⅔, par. 1–102(d)(iii).) Further, it is the burden of the utility seeking rate increases to prove that "any operating expense for which it seeks reimbursement directly benefits the ratepayers or the services which the utility renders." *Candlewick Lake Utilities Co. v. Illinois Commerce Comm'n*, 122 Ill. App. 3d at 227, 460 N.E.2d at 1196 (citing *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*, 55 Ill. 2d at 482-83).

In *Governor's Office of Consumer Services v. Illinois Commerce Comm'n* (1991), 220 Ill. App. 3d 68, 72, 580 N.E.2d 920, 923, we acknowledged that the expression "long-term cost" was not defined in

the statute and that the Attorney General had not provided or recommended a definition for the purpose of selecting an appropriate marginal cost study for redesigning Illinois Power Company's electric service rates. In *Governor's Office*, Illinois Power provided an equal percentage of marginal cost study (EPMC) based on the utility's five-year projection of the cost of energy to its system. The Attorney General proposed that its own study, based on a 10-year projection of costs, including consideration of the effects of the utility's excess capacity, would result in fairer treatment for residential customers. The Attorney General argued that the utility's EPMC study was improperly based on "short-term" considerations in violation of the statute. Having considered the parties' arguments, we found that either the utility's five-year estimate or the Attorney General's 10-year projection of costs could qualify as "long-term," and we deferred to the Commission's discretion in adopting the EPMC approach as proposed by the utility.

Obviously, the issue posed by *Governor's Office* concerned the projection of future costs of providing services. And, I have no doubt but that the legislature contemplated that its expression of "long-term costs" would generally apply to estimations of costs relating to services to be provided to customers over a reasonable period in the future. However, the legislatively granted authority to adjust utility rates reflecting the "long-term" cost of services does not, by my view, empower the Commission to pass on to customers estimated or unknown future costs to remediate management decisions (as in most instances here) rendered by the utilities in the distant past. In my opinion, the statute could hardly be clearer in requiring that costs reflected in utility rates may not be unrelated to services provided to current ratepayers.

The remediation costs here at issue are for cleaning up sites decommissioned some 40 or 50 years ago. The Commission, moreover, acknowledged in its order that the coal tar cleanup expenses "have no link to the provision of current utility service to ratepayers." Thus, the Commission's self-appointed policy-making authority notwithstanding, I remain convinced that the Commission's "sharing" decision violated its statutory authority and that no part of the coal tar cleanup costs may be charged to ratepayers. The mere fact that the remediation costs are current expenses of the utilities does not, in my opinion, require a hybrid characterization of the expenses or novel treatment for ratemaking purposes. Inasmuch as the remediation costs relate solely to past management practices in most instances and the provision of utility services to past customers, I would find that they

may not be recovered in whole or in part without violating regulatory principles prohibiting retroactive and single-issue ratemaking. See *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1991), 146 Ill. 2d 175, 243, 585 N.E.2d 1032, 1061, citing *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1989), 136 Ill. 2d 192, 209, 555 N.E.2d 693.

Unless and until the legislature says otherwise, I find no authority for the Commission's approval of remediation costs in the rider tariff. I would hold that the Commission's approval of any part of the remediation costs in the coal tar rider was unauthorized and an abuse of the Commission's discretion as a matter of law.